# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JAMAINE GAITOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )    Civil Action No. 21-CV-12079-AK |
| v. | ) |
| | ) |
| CITY OF BOSTON, LEROY PEEPLES, | ) |
| TALIA WRIGHT-RIVERA, and | ) |
| WASCAR CASTILLO, | ) |
| | ) |
| Defendants. | ) |

|  |  |
|---|---|
| SEAN D. PITTS, | ) |
| | ) |
| Plaintiff, | )    Related Action |
| | )    Civil Action No. 21-CV-12091-AK |
| v. | ) |
| | ) |
| CITY OF BOSTON, LEROY PEEPLES, | ) |
| TALIA WRIGHT-RIVERA, and | ) |
| WASCAR CASTILLO, | ) |
| | ) |
| Defendants. | ) |

|  |  |
|---|---|
| STEPHEN D. POWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | )    Related Action |
| | )    Civil Action No. 21-CV-12093-AK |
| v. | ) |
| | ) |
| CITY OF BOSTON, LEROY PEEPLES, | ) |
| TALIA WRIGHT-RIVERA, and | ) |
| WASCAR CASTILLO, | ) |
| | ) |
| Defendants. | ) |

```
_____
                                    )
UNDINI SANZ,                        )
                                    )
              Plaintiff,            )
                                    )         Related Action
                                    )         Civil Action No. 22-CV-10042-AK
v.                                  )
                                    )
CITY OF BOSTON, LEROY PEEPLES,      )
TALIA WRIGHT-RIVERA, and            )
WASCAR CASTILLO,                    )
                                    )
              Defendants.           )
_____    )
```

### MEMORANDUM AND ORDER ON DEFENDANTS' PARTIAL MOTIONS FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS JAMAINE GAITOR, SEAN D. PITTS, AND STEPHEN D. POWELL, AND MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF UNDINI SANZ

**ANGEL KELLEY, D.J.**

Plaintiffs in the instant matter, Jamaine Gaitor, Sean D. Pitts, Stephen D. Powell, and Undini Sanz, along with Tereck Jamison who has now settled his case, each sued the City of Boston and several of the managers from the Street Outreach, Advocacy and Response ("SOAR") Program, a department of the Boston Center for Youth and Families ("BCYF"), which focuses on working with and supporting gang-involved youth in Boston. After a revamp of the program in 2019, during which the Streetworker Program transitioned into SOAR, the Plaintiffs, many of whom had worked in the Program for decades, claimed to notice and experience a series of discriminatory and retaliatory actions at the hands of their new supervisors.

This matter, comprised of five consolidated cases originally covering more than 115 claims, was previously removed from state court. Following the respective Motions to Dismiss, 40 claims remained. Defendants have now moved for Summary Judgment on 34 claims. While

the Motions were pending, Jamison agreed to settle his remaining claims and the Motion for Summary Judgment as to Jamison has been denied as moot. [Dkt. 275]. For the following reasons, Defendants' Partial Motion for Summary Judgment on Complaint of Jamaine Gaitor [Dkt. 220] is **GRANTED IN PART** and **DENIED IN PART**; Defendants' Partial Motion for Summary Judgment on Complaint of Stephen Powell [Dkt. 221] is **GRANTED IN PART** and **DENIED IN PART**; Defendants' Partial Motion for Summary Judgment on Complaint of Sean Pitts [Dkt. 222] is **GRANTED IN PART** and **DENIED IN PART**; and, Defendants' Motion for Summary Judgment on Complaint of Undini Sanz [Dkt. 223] is **GRANTED IN PART** and **DENIED IN PART**.[1]

## I.      BACKGROUND

In evaluating the Motions for Summary Judgment, the Court relies on the parties' statements of material facts, responses thereto, and any attached exhibits the parties have submitted. The Court accepts as true each material fact to the extent it has not been disputed by the opposing party and considers contested material facts that either party has disputed. Unless otherwise noted, the facts below are undisputed. While the Motions for Summary Judgment are considered as consolidated, it is necessary for the Court to identify the relevant facts as to each Plaintiff.

### A.      Factual Background

#### 1.      The SOAR Program

The City of Boston ("the City") began hiring managers for the Street Outreach, Advocacy and Response Program in 2019, revamping the Streetworker Program operated by the same City department, the Boston Center for Youth and Families. [Dkt. 255 at ¶¶ 1-3]. Through the

---

[1] For purposes of clarity and ease, charts of the remaining claims have been included as Appendix I.

program, Streetworkers, now called Outreach and Engagement Coordinators ("OECs"), assisted gang-involved youth in finding ways to advance themselves and other community members, in navigating court proceedings and probation, and in responding to local gang-disputes and homicides. [Dkt. 255 at ¶¶ 4-6]. To conduct their work, Streetworkers/OECs were assigned neighborhoods with an associated gang presence in the greater Boston community where they were expected to interact and make connections with gang-impacted youth and their surrounding community. [Dkt. 231 at ¶ 7]. All Plaintiffs were working as Streetworkers when the organization transitioned into SOAR Boston. [Dkt. 231 at ¶ 3]. Of the 46 people employed by SOAR since September 2019, 39 were Black. [Dkt. 255 at ¶ 8]. By April 2020, 26 of SOAR's approximate 31 employees were Black, with the remaining five non-Black employees acting as OECs. [Dkt. 231 at ¶¶ 103-04]. Beyond SOAR, 30.24% of the City of Boston's current employees and 39.32% of BCYF's current employees are Black. [Dkt. 255 at ¶¶ 9-10].

SOAR's OECs are represented by the Service Employees International Union ("SEIU") and subject to a collective bargaining agreement. [Dkt. 231 at ¶¶ 8-9]. Per the Collective Bargaining Agreement, SOAR maintained a Progressive Discipline Policy, requiring a verbal and then written warning before suspension. [Dkt. 255 at ¶¶ 166-67]. Jamaine Gaitor and Tereck Jamison both held leadership positions within the SEIU, as a Union Steward for Streetworkers/OECs and as a Chapter Board Member, respectively. [Dkt. 255 at ¶¶ 14, 21].

In July 2019, Talia Wright-Rivera was hired to be SOAR's Director and, at about the same time, Leroy Peeples was hired as Strategy and Operations Manager. [Dkts. 231 at ¶ 2; 255 at ¶ 25]. Wascar Castillo was the Director of Human Resources for BCYF and thus had SOAR's employees under his purview. [Dkt. 255 at ¶ 26]. According to Plaintiffs, once Wright-Rivera and Peeples assumed their position as managers, "the environment in the group became hostile

and toxic." [Dkts. 243 at ¶ 71; 246 at ¶ 9]. For example, for at least 14 years prior to Wright-Rivera's hiring, Streetworkers/OECs had been allowed to take their own vehicles to meet with constituents, but in December 2019, Wright-Rivera announced they would have to travel together in vans to conduct their outreach to community members ("Van Policy"). [Dkt. 255 at ¶¶ 136-37]. According to her Answers to Interrogatories, Wright-Rivera justified the Van Policy as necessary to increase community presence, while also offering time for training opportunities. [Dkt. 231-7 at 2]. Plaintiff Jamaine Gaitor alleges that the Van Policy was unpopular with workers, as it reduced the amount of time OECs could spend with constituents and the crowded conditions jeopardized the health of workers with preexisting medical conditions. [Dkt. 248 at ¶¶ 39-42].

Additionally, in support of claims regarding age discrimination and retaliation, Plaintiffs allege that several OECs heard SOAR management make "cracks" about older workers, including two employees over the age of 60, Robert Miller and Bobby Joe Leaster. [Dkt. 255 at ¶¶ 39-40]. Specifically, Plaintiffs allege that Wright-Rivera and Peeples would target Miller, a Senior Streetworker/OEC being treated for stage 4 colon cancer, assigning him tasks that were physically challenging given his condition and "laugh[ing] at him both behind his back and in front of him." [Dkts. 248 at ¶¶ 22-26; 255 at ¶ 60]. Plaintiffs assert that both Wright-Rivera and Peeples would tell employees if they were over 40, "they were too old for the job" and further, older Streetworkers/OECs report feeling that they were being passed over for promotional opportunities. [Dkt. 255 at ¶¶ 41, 46, 162]. Plaintiffs claim that all were aware of this pattern of comments, with some even elevating to management and union representatives. [Id. at ¶¶ 50-51, 69].

Other changes were made in 2020 to SOAR's policies, including implementing a system,

Efforts to Outcome ("ETO"), which is a case management system used to measure different program outcomes. [Id. at ¶ 123; Dkt. 231-5 at 10]. OECs were assessed based on their "touchpoints" with constituents. [Dkt. 231 at ¶¶ 33-58]. Additionally, Plaintiffs were concerned how and what information was being collected, believing there existed an agreement to cooperate with law enforcement that, if discovered, would endanger OEC's lives. [Dkt. 255 at ¶¶ 125-29, 132].

In March 2020, at the beginning of the COVID-19 pandemic, SOAR allowed employees to work from home for a few weeks. [Dkt. 231 at ¶ 12]. Plaintiffs claim that in early April 2020, however, as a result of an "angry" Zoom call with Wright-Rivera, OECs were ordered to return to in-person work and were subsequently forced to "get into crowded vans" in line with the Van Policy. [Dkt. 255 at ¶¶ 141-42]. As the COVID-19 pandemic continued, Plaintiffs claim that SOAR generally lacked virus protocols—requiring indoor roll call for a period of time, allowing the public to enter their building without COVID-19 screenings, and not providing masks or gloves for employees. [Id. at ¶¶ 171-74]. Plaintiffs assert that when OECs complained to management about the lack of COVID-19 protocols on or about October 8, 2020, Wright-Rivera replied, "do what you have to do." [Id. at ¶ 180].

In light of the above, an email dated October 9, 2020 ("October 9 Letter"), was sent from SOARboston@gmail.com to City leadership, including the Mayor and BCYF Commissioners, which Plaintiffs contend was written jointly by SOAR Employees in response to Wright-Rivera's comments and actions. [Id. at ¶¶ 181-82]. After the email was sent, Plaintiffs claim Wright-Rivera and Peeples began to investigate the origins of the message. [Id. at ¶ 183]. Around the same time, the organization was investigating the origins of an alternative acronym for SOAR, "Snitching on All Residents." [Id. at ¶ 198]. Later, employees drafted two unsigned letters dated

November 4, 2020 ("November 4 Letter") and November 19, 2020 ("November 19 Letter") that expressed concerns about the organization's lack of COVID-19 protocols and the "punitive and hostile environment." [Dkts. 231 at ¶ 109; 255 at ¶ 231]. Plaintiffs allege that leadership at BCYF met with SOAR employees to discuss its contents and learn about its authors. [Dkt. 255 at ¶ 231]. Plaintiffs Powell and Sanz, as well as Jamison and other SOAR employees, electronically signed the letters in January 2021. [Dkt. 231 at ¶ 110].

### 2.    Jamaine Gaitor

Jamaine Gaitor is a 48-year-old Black man and former Streetworker/OEC at SOAR. [Dkt. 255 at ¶¶ 12-13]. Gaitor, a military veteran, claims he developed PTSD from his time in the service and experiences panic attacks. [Id. at ¶ 152]. After observing Wright-Rivera and Peeples' treatment of Miller, Gaitor claims to have spoken to Peeples about their conduct. [Id. at ¶¶ 60, 62]. Later, in December 2019, Wright-Rivera denied Gaitor's request to use accrued vacation time, claiming that he had failed to give "proper and timely notice"; however, Gaitor claims that her actions caused him to lose 70 hours in accrued vacation time and were "retaliatory for his complaints about discrimination." [Id. at ¶ 76].

In January 2020, shortly after the announcement of the Van Policy, Gaitor claims that he expressed his concern about having a panic attack in the "crowded van" to Wright-Rivera and requested to use his personal vehicle, as opposed to the van, to travel to his assigned neighborhood. [Id. at ¶ 152]. Gaitor asserts that Wright-Rivera denied his request, even after witnessing him experience an anxiety attack in the van, and continued to require him to travel in the organization's van. [Id. at ¶¶ 153-54]. To avoid the risk of having another anxiety attack, Gaitor chose to take a personal day without prior approval from his supervisor(s), and was consequently suspended for one day. [Id. at ¶ 155; Dkt. 231-23 at 3]. According to Plaintiffs,

this was a violation of the Collective Bargaining Agreement's Progressive Discipline Policy. [Dkt. 255 at ¶ 166]. Conversely, Defendants assert that, after objecting, Gaitor was not, in fact, required to ride in the van. [Dkt. 231 at ¶ 18].

Around October 13, 2020, Gaitor signed onto a Zoom meeting using SOARBoston@gmail.com, the same email address that sent the October 9 Letter to City officials. [Id. at ¶ 204]. According to Plaintiffs, in response, Wright-Rivera and a Labor Relations employee questioned Gaitor on which computer he had been using and whether he had sent the October 9 Letter. [Id. at ¶¶ 205, 207]. Gaitor denied authoring the letter because, Plaintiffs claim, he would lose his job. [Id. at ¶ 207]. Shortly thereafter, Gaitor claims to have overheard a conversation in late October 2020 between Wright-Rivera, Peeples, Castillo, and another BCYF official, during which he alleges he overheard Wright-Rivera say, "I want him out of here. He needs to go," and the BCYF official stated, "What's taking us so long to get rid of Gaitor in the first place?" [Dkt. 231 at ¶ 74].

Around the same time, Castillo reached out to Gaitor to discuss whether there was a "hostile environment at SOAR," and they spoke on November 2, 2020, in what Plaintiffs claim Castillo characterized as a confidential conversation. [Dkt. 255 at ¶¶ 206, 208-09]. During the conversation, Castillo claims that Gaitor admitted to the existence of a hostile work environment at SOAR but denied complaining about it. [Id. at ¶ 210]. Nonetheless, Plaintiffs assert that Gaitor informed Castillo of Peeples and Wright-Rivera's history of retaliation during this conversation. [Id. at ¶ 211]. The next day, Gaitor received a letter, dated November 2, 2020 and signed by Wright-Rivera, that informed him of his termination. [Id. at ¶ 212; Dkt. 231 at ¶ 75].

### 3.    Sean Pitts

Sean Pitts is a 53-year-old Black man who first began working as a Streetworker in 1999

and was the longest-tenured Streetworker in the program before his resignation.  [Dkt. 255 at ¶¶ 18-19].  Pitts claims he heard Peeples and Wright-Rivera make disparaging comments about older employees, including encouraging those above the age of 40 to quit, calling them "deadweight," and threatening to work them until they quit.  [Dkt. 246 at ¶¶ 11-16].  Feeling that older workers were being mistreated, Pitts claims he complained to union representatives, including Larry Higgins, about Peeples' and Wright-Rivera's comments.  [Id. at ¶¶ 15-16].

At the beginning of the COVID-19 pandemic, another SOAR employee, Dennis Avila, was exposed to COVID-19 by a constituent while driving in the organization's van.  [Dkts. 231 at ¶ 89; 255 at ¶ 147].  He soon tested positive for COVID-19.  [Dkt. 255 at ¶ 148].  Because of this incident, Pitts became concerned about his ill mother's health and spoke to Peeples about taking his personal vehicle to his assigned neighborhood rather than using the van.  [Dkts. 231 at ¶ 21; 255 at ¶¶ 158-59].  Plaintiffs claim that in this conversation Peeples denied Pitts' request, instead suggesting he "take some time off."  [Dkts. 231 at ¶ 21; 255 at ¶ 160].  Shortly after, Pitts applied for FMLA and was approved to take leave in June 2020.  [Dkt. 255 at ¶ 161].

While on leave, in August 2020, Pitts applied for a promotion to Senior Streetworker but did not receive the position.  [Id. at ¶ 163-65].  Plaintiffs believe Pitts was denied this promotion because he "requested that he take his car instead of the crowded van, and because of his age." [Id.].  Pitts' FMLA leave ended on September 14, 2020; however, Plaintiffs claim Pitts had previously contacted several SOAR-affiliates to discuss a leave extension, including his supervisor, Robyn Christian, and even sending Castillo "FMLA paperwork" with his doctor's signature.  [Id. at ¶¶ 184, 186-87, 193-94].  In response, according to Plaintiffs, Pitts was sent a letter that contained an ultimatum to return to work or resign.  [Id. at ¶ 195].  Believing he had no other leave options available, according to Plaintiffs, Pitts resigned to take care of his mother on

October 13, 2020.  [Id. at ¶¶ 190, 197; Dkt. 231 at ¶ 26].

### 4.    Stephen Powell

Stephen "Donnie" Powell is a 56-year-old Black man who became a Streetworker in 2008.  [Dkt. 255 at ¶ 16].  Powell claims Peeples and Wright-Rivera would target older workers and try to "get older workers to leave."  [Dkt. 247 at ¶¶ 19-22].  Concerned about management pushing himself and other employees out, Powell raised these complaints to union representatives.  [Dkt. 247 at ¶¶ 19, 21].

At the time, Powell shared a caseload with Pitts, which increased to 61 constituents in 2020, according to Plaintiffs.  [Dkt. 255 at ¶¶ 82-83].  Powell continued to handle the same caseload, even after Pitts went on FMLA leave without a replacement.  [Id. at 83-84].  Plaintiffs characterize this decision as "impractical, inefficient, and a disservice to the kids."  [Id. at ¶¶ 83-84, 88].

Powell suffers from asthma, arthritis, anxiety, and claustrophobia.  [Dkts. 247 at ¶ 63; 255 at ¶ 221].  Shortly after the Van Policy was instituted in December 2019, Powell indicated that due to his anxiety, he could not ride in vehicles with more than two to three people and may require an accommodation from the policy.  [Dkt. 231 at ¶ 67].  A few months later, near the beginning of the pandemic, Plaintiffs claim that as a result of Powell's refusal to comply with the Van Policy he was disciplined with a written warning in violation of the Progressive Discipline Policy contained in the Collective Bargaining Agreement.  [Dkt. 255 at ¶ 166].  Shortly thereafter, on May 1, 2020, Castillo sent a letter to Powell in response to his request for a disability accommodation, asking for additional documentation.  [Dkt. 231 at ¶¶ 66-67].

After Gaitor was fired in November 2020, Powell stepped into Gaitor's place as a Union Steward.  [Dkt. 255 at ¶ 214].  Around this time, he saw his touchpoints double.  [Id. at ¶ 232].

That same month, the November 4 and 19 Letters regarding SOAR's management and lack of COVID-19 policies were sent to City officials. [Id. at ¶ 231; Dkt. 231 at 109]. Plaintiffs contend that Powell met with William Morales, Commissioner of BCYF, about the November 19 Letter, during which Powell admitted to drafting the letter. [Dkt. 255 at ¶ 231].

Shortly after, Plaintiffs claim that Powell was exposed to COVID-19 by two colleagues and became ill. [Id. at ¶¶ 215-16]. Consequently, Wright-Rivera, according to Plaintiffs, became upset with Powell for disclosing his illness to others. [Id. at ¶ 217]. As a result of his illness, Powell went on leave and developed long-COVID that persisted for months. [Id. at ¶ 220; Dkt. 247 at ¶ 96]. Powell remained on leave for approximately 15 months. [Dkt. 231 at ¶ 80]. Powell claims to have tried to return to SOAR in 2021 but was allegedly told to reapply. [Dkt. 247 at ¶ 99]. Powell interpreted SOAR's demand that he reapply as being "constructively discharged"—essentially, that he was fired without being told he was fired—from the organization. [Dkt. 231 at ¶ 83-84]. According to Defendants, on March 3, 2021, Powell emailed Castillo, Wright-Rivera, and others to formally resign. [Id.].

### 5.    Undini Sanz

Undini Sanz, an Afro-Hispanic woman, was hired by the Streetworker Program in 2016. [Dkts. 249 at ¶ 2; 255 at ¶ 23]. Plaintiffs claim Sanz heard, on numerous occasions, Peeples and Wright-Rivera make "inappropriate remarks" about older workers and eventually alerted Shawn Webb, a former Streetworker manager, to these statements. [Dkts. 249 at ¶ 7; 255 at ¶ 69]. After Sanz complained of discrimination in 2020, her caseload, according to Plaintiffs, increased from 15 constituents—a usual caseload—to 63 constituents. [Dkt. 255 at ¶ 77].

In 2019 and 2020, Sanz had difficulty requesting time off from SOAR. Plaintiffs allege that Sanz was written up and investigated for taking emergency family leave without permission

in December 2019 even though she had already submitted the applicable FMLA forms and had been approved by Wright-Rivera.  [Id. at ¶¶ 168-70].  Later in 2020, Plaintiffs assert, after the violent death of her constituent, Sanz requested Wright-Rivera for a day off, but Wright-Rivera denied the request in an alleged violation of the Collective Bargaining Agreement.  [Id. at ¶¶ 115-16].

Plaintiffs claim Sanz has several medical conditions, including anxiety, depression, and PTSD; additionally, Plaintiffs claim her son suffers from asthma.  [Id. at ¶¶ 145, 148].  Plaintiffs allege that after the Van Policy was instituted, Sanz submitted a letter from her doctor noting her conditions and requesting an accommodation.  [Id. at ¶ 145].  Despite the letter, in December 2019, Sanz was disciplined for taking her own vehicle, in, as Plaintiffs contend, a violation of the Progressive Discipline Policy outlined in the Collective Bargaining Agreement.  [Id. at ¶¶ 150, 166].  Plaintiffs assert that Peeples still required Sanz to travel in the van, even at the beginning of the COVID-19 pandemic in April 2020, despite Avila notifying management of his exposure to COVID-19.  [Id. at ¶ 146].  Around the same time, according to Plaintiffs, Sanz learned Avila continued coming into work based on Wright-Rivera's direction and grew concerned given her son's respiratory condition.  [Id. at ¶¶ 147-48].  Sanz raised the issue to her supervisor, Robyn Christian.  [Id.].

According to Plaintiffs, the norm was to assign two Streetworkers for each location; however, Sanz was the only Streetworker assigned to the Heath Street gang, one of the largest in the City.  [Id. at ¶¶ 80-81].  Plaintiffs state that Peeples and Wright-Rivera would deny or prevent Sanz from accessing resources she needed to complete her job, including failing to acquire permits for a planned event or allowing communication with the First Trauma Response Team.  [Id. at ¶¶ 109-14].  In July 2020, Plaintiffs claim because the "stress [of] the environment

at SOAR" caused anxiety and depression, Sanz was forced to go on FMLA leave.  [Dkts. 231 at ¶ 32; 249 at ¶ 33].

Months later, in February 2021, Sanz returned from leave and, according to Plaintiffs, a constituent told Sanz that her life could be in danger if she remained in the area.  Sanz informed management of this concern and asked for reassignment.  [Dkt. 249 at ¶¶ 34-35].  According to Sanz, management of SOAR refused to respond to her concerns and she was forced to continue to return to her assigned neighborhood.  [Id. at ¶ 35].  Powell would regularly go with Sanz in light of the safety concerns.  [Id. at ¶ 36].  Eventually, because of the fear and anxiety from continuing to return to the assigned Heath Street neighborhood, Sanz applied for and went on FMLA leave again in July 2021.  [Id. at ¶ 37].  Shortly after, Sanz applied for and received a job offer from the Boston Public Schools.  [Dkt. 255 at ¶¶ 226-27].  According to Plaintiffs, Sanz believed due to the schedule of the position, as well as her knowledge of others holding more than one city job at a time, she could work at both SOAR and Boston Public Schools.  [Id.; Dkt. 231 at ¶ 96].  Additionally, she claims to have submitted a conflict waiver to work both jobs and to have discussed this arrangement with Castillo.  [Dkt. 255 at ¶¶ 227-28].  Around September 7, 2021, Sanz was terminated by SOAR without warning.  [Id. at ¶ 229].

### B.    Procedural History

The instant matter is comprised of five consolidated cases, previously removed from state court.  The lead case, brought by Jamaine Gaitor, was removed on December 20, 2021.  The cases of Sean Pitts and Stephen Powell were removed on the same day.  The cases of Undini Sanz and Tereck Jamison followed shortly thereafter, removed from state court on January 12, 2022 and June 30, 2022, respectively.  Each of these cases named the Plaintiffs former employer, the City of Boston, their former managers, Leroy Peeples and Talia Wright-Rivera, and their

former HR director, Wascar Castillo, as defendants.

On January 19, 2022, Defendants filed a Motion to consolidate the cases [Dkt. 7], which was granted on January 28, 2022.  [Dkt. 12].  Jamison's Complaint, the last to be filed, was consolidated on August 1, 2022.  [Dkt. 6] (22-CV-11055).  Defendants first moved to dismiss the first four Plaintiffs' Complaints on February 16, 2022 [Dkts. 17, 23, 29, 34] and on September 12, 2022, Defendants moved to dismiss Jamison's Complaint.  [Dkt. 82].  Thereafter, on September 29, 2022, the first four Plaintiffs were allowed to amend their original Complaints. [Dkt. 86].  On November 18, 2022, Defendants moved to dismiss each of the first four Plaintiffs' Amended Complaints.  [Dkts. 98-105].  During a Hearing, which took place from August 23 to August 25, 2023, Judge Wolf orally resolved the Motions to Dismiss.  [Dkts. 147-51, 153-57].

### 1.    Jamaine Gaitor

In his Amended Complaint, Gaitor alleges 14 claims: (1) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City; (2) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City; (3) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City; (4) failure to accommodate disability, in violation of G.L. c. 151B, § 4(16), against the City; (5) failure to accommodate disability in violation of 42 U.S.C. § 12111, against the City; (6) retaliation in violation of G.L. c. 151B, § 4(4), against all Defendants; (7) retaliation in violation of 42 U.S.C. § 2000e-3(a), against the City; (8) unlawful aiding and abetting of discriminatory actions in violation of G.L. c. 151B, § 4(5), against all Defendants; (9) unlawful interference with Gaitor's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against all Defendants; (10) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City; (11) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, §

185(b)(3), against the City; (12) intentional infliction of emotional distress, against all Defendants; (13) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City; (14) negligent hiring and promotion in violation of G.L. c. 258, § 10(j), against the City. [Dkt. 88].

Following the Motion Hearing and Judge Wolf's oral ruling on the Defendants' Motion to Dismiss, the proceeding claims survived: (1) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City; (2) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City; (3) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City; (6) retaliation in violation of G.L. c. 151B, § 4(4), against all Defendants; (7) retaliation in violation of 42 U.S.C. § 2000e-3(a), against the City; (8) unlawful aiding and abetting of discriminatory actions in violation of G.L. c. 151B, § 4(5), against Castillo; (9) unlawful interference with Gaitor's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against the City, Peeples, and Castillo; (10) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City; (11) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(3), against the City; (13) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City.  [Dkts. 147-48, 154].  Defendants have now moved for summary judgment as to Counts I and II, VI through IX, and XI.  [Dkt. 220].  Defendants have not moved for summary judgment as to Counts III, X, and XIII, and thus survive.

### 2.    Sean Pitts

In his Amended Complaint, Pitts alleges 12 claims: (1) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City; (2) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City; (3) discrimination

based on age in violation of 29 U.S.C. § 621 et seq., against the City; (4) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City; (5) retaliation in violation of G.L. c. 151B, § 4(4), against all Defendants; (6) retaliation in violation of 42 U.S.C. § 2000e-3(a), against the City; (7) unlawful aiding and abetting of discriminatory actions in violation of G.L. c. 151B, § 4(5), against all Defendants; (8) unlawful interference with rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against all Defendants; (9) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(3), against the City; (10) intentional infliction of emotional distress, against all Defendants; (11) negligent hiring and promotion in violation of G.L. c. 258, § 10(j), against the City; (12) retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2611 and 2614, against all Defendants.  [Dkt. 89].

Following the Motion Hearing and Judge Wolf's oral ruling on the Defendants' Motion to Dismiss, the proceeding claims survived: (1) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City; (2) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City; (3) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City; (4) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City; (8) unlawful interference with rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against the City and Peeples. [Dkts. 151, 156].  Defendants have now moved for summary judgment as to Counts I, II, and VIII.  [Dkt. 222].  Defendants have not moved for summary judgment as to Counts III and IV, and thus survive.

### 3.    Stephen Powell

In his Amended Complaint, Powell alleges 14 claims: (1) discrimination based on race

and color in violation of G.L. c. 151B, § 4(1), against the City; (2) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City; (3) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City; (4) failure to accommodate disability, in violation of G.L. c. 151B, § 4(16), against the City; (5) failure to accommodate a disability in violation of 42 U.S.C. § 12111, against the City; (6) retaliation in violation of G.L. c. 151B, § 4(4), against all Defendants; (7) retaliation in violation of 42 U.S.C. § 2000e-3(a), against the City; (8) unlawful aiding and abetting of discriminatory actions in violation of G.L. c. 151B, § 4(5), against all Defendants; (9) unlawful interference with Powell's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against all Defendants; (10) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City; (11) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(3), against the City; (12) intentional infliction of emotional distress, against all Defendants; (13) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City; (14) negligent hiring and promotion in violation of G.L. c. 258, § 10(j), against the City. [Dkt. 90].

Following the Motion Hearing and Judge Wolf's oral ruling on the Defendants' Motion to Dismiss, the proceeding claims survived: (1) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City; (2) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City; (3) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City; (6) retaliation in violation of G.L. c. 151B, § 4(4), against the City, Peeples, and Wright-Rivera; (7) retaliation in violation of 42 U.S.C. § 2000e-3(a), against the City; (9) unlawful interference with Powell's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against the City and Peeples;

(10) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City; (11) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(3), against the City; (13) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City. [Dkts. 149-50, 155]. Defendants have now moved for summary judgment as to Counts I and II, VI and VII, and IX through XI. [Dkt. 221]. Defendants have not moved for summary judgment as to Counts III and XIII, and thus survive.

### 4. Undini Sanz

In her Second Amended Complaint, Sanz alleges 14 claims[2]: (1) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City; (2) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, §185(b)(3), against the City; (3) intentional infliction of emotional distress, against all Defendants; (5) tortious interference, against Peeples; (6) retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2611 & 2615, against the City; (7) violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2611 & 2614, against all Defendants; (8) violation of the Massachusetts Paid Family and Medical Leave Act, G.L. c. 175M, §9, against all Defendants; (9) negligent hiring and promotion in violation of G.L. c. 258, § 10(j), against the City; (10) failure to accommodate Plaintiff's disability in violation of G.L. c. 151B, § 4(16), against the City; (11) failure to accommodate Plaintiff's disability in violation of 42 U.S.C. § 12111, et seq., against the City; (12) retaliation in violation of G.L. c. 151B, § 4(4), against the City; (13) retaliation in violation of 42 U.S.C. 2000e-3(a), against the City; (14) unlawful interference with Plaintiff's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against all Defendants; (15) unlawful aiding and abetting of discriminatory actions, in violation of G.L. c. 151B, § 4(5),

---

[2] Sanz did not allege a "Count IV." The Court will maintain Sanz's numbering convention.

against all Defendants.  [Dkt. 91].

Following the Motion Hearing and Judge Wolf's oral ruling on the Defendants' Motion to Dismiss, the proceeding claims survived: (1) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City; (2) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(3), against the City; (3) intentional infliction of emotional distress, against all Defendants; (5) tortious interference, against Peeples; (10) failure to accommodate Plaintiff's disability in violation of G.L. c. 151B, § 4(16), against the City; (11) failure to accommodate Plaintiff's disability in violation of 42 U.S.C. § 12111, et seq., against the City; (12) retaliation in violation of G.L. c. 151B, § 4(4), against the City; (13) retaliation in violation of 42 U.S.C. 2000e-3(a), against the City; (14) unlawful interference with Plaintiff's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against the City and Peeples.  [Dkts. 151, 157].  Sanz subsequently voluntarily dismissed Count III for intentional infliction of emotional distress, against all Defendants, and Count V for tortious interference, against Peeples.  [Dkt. 214].  Defendants have now moved for summary judgment as to all remaining claims.  [Dkt. 223].

## II.    LEGAL STANDARD

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law.  Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted).  The Court must consider (1) whether a factual dispute exists; (2) whether the factual

19

dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving

party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such

that it "might affect the outcome of the suit under the applicable substantive law." Scott v.

Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V

DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).

Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the

light most favorable to the non-moving parties." Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40

(1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir.

1999)).  A non-moving party may "defeat a summary judgment motion by demonstrating,

through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at

49 (citation omitted).  Submissions of evidentiary quality include "depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made

for purposes of the motion only), admissions, interrogatory answers, or other materials." See

Fed. R. Civ. P. 56(c)(1)(A).  More specifically, "provided that the nonmovant's deposition

testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect

the outcome of the trial, the testimony must be accepted as true for purposes of summary

judgment." Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st Cir.

2007).  This extends to affidavits "containing relevant information of which he has first-hand

knowledge, [which] may be self-serving, but [are] nonetheless competent to support or defeat

summary judgment." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st

Cir. 2000) (internal quotation marks omitted) (quoting Cadle Co. v. Hayes, 116 F.3d 957, 961

n.5 (1st Cir.1997)).  Conversely, "[i]t is black-letter law that hearsay evidence cannot be

considered on summary judgment." Davila v. Corporacion De Puerto Rico Para La Difusion

Publica, 498 F.3d 9, 17 (1st Cir. 2007) (citing Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st

Cir. 1998); Garside, 895 F.2d at 49); see also Fed. R. Civ. P. 56(e).

On issues where the non-moving party bears the ultimate burden of proof, the non-

moving party "must present definite, competent evidence to rebut the motion."  Mesnick, 950

F.2d at 822; see also Lewis v. Gillette, Co., 22 F.3d 22, 24 (1st Cir. 1994) ("When the non-

moving party bears the burden of persuasion at trial, however, to avoid summary judgment he

must make a 'showing sufficient to establish the existence of [the] element[s] essential to [his]

case.'" (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986))).  With that said,

"[w]hile the plaintiff does bear 'the burden of producing evidence' . . . , the burden of persuasion

at summary judgment remains with the defendants, who, 'as the moving part[ies], "ha[ve] the

burden of affirmatively demonstrating the absence of a genuine issue of material fact on every

relevant issue, even if [they] would not have the burden on an issue if the case were to go to

trial."'" Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 34 (Mass. 2016) (first quoting Matthews

v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1308 (Mass. 1997); and then quoting

Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 529 (Mass. 2005)).

In employment discrimination cases, "courts should exercise particular caution before

granting summary judgment for employers on such issues as pretext, motive, and intent."

Santiago-Ramos, 217 F.3d at 54 (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167

(1st Cir. 1998)); see also Sullivan, 825 N.E.2d at 529 ("[T]he question of the employer's state of

mind (discriminatory motive) is 'elusive and rarely is established by other than circumstantial

evidence.'" (quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d 111, 114

(Mass. 1995))).

## III.    DISCUSSION

Defendants begin by arguing that Plaintiffs have waived several of their claims because a

claim under the Massachusetts Whistleblower Act is exclusive and waives claims under "any

other contract, collective bargaining agreement, state law, rule or regulation, or under the

common law."  MASS. GEN. LAWS ch. 149, § 185(f).  The Court will begin by addressing the

issue of waiver before turning to each of the substantive counts.

### A.    Waiver

Defendants claim that "[t]his Court should grant summary judgment on the various

claims of retaliation, aiding and abetting, and unlawful interference," [Dkt. 225 at 13], because

under the Massachusetts Whistleblower Act, "the institution of a private action in accordance

with subsection (d) shall be deemed a waiver by the plaintiff of the rights and remedies available

to him, for the actions of the employer or public utility employer, under any other contract,

collective bargaining agreement, state law, rule or regulation, or under the common law."  MASS.

GEN. LAWS ch. 149, § 185(f).  In the Defendants' reading, because of claims made under the Act,

see Mass. G.L. c. 149, § 185(b)(1), (b)(3), Plaintiffs' following claims, against all parties, must

be waived: (1) retaliation in violation of Mass. G.L. c. 151B, § 4(4); (2) retaliation in violation of

42 U.S.C. § 2000e-3(a); (3) unlawful aiding and abetting of discriminatory actions in violation of

Mass. G.L. c. 151B, § 4(5); and, (4) unlawful interference with Plaintiffs' rights under the anti-

discrimination statute in violation of G.L. c. 151B, § 4(4A).  This Court agrees in part and

disagrees in part.

"Although appellate guidance is lacking, the foregoing provision of the Whistleblower

Act has been consistently construed in reported decisions at the trial court level to bar the

assertion of statutory and common law damage claims that in substance derive from the same

22

conduct forming the basis for a retaliation claim instituted under G.L. c. 149, Sec. 185(d)."

Fitzgerald v. Commonwealth, No. 14-2203-C, 2015 WL 924984, at *2 (Mass. Super. Ct. Feb. 26,

2015) (collecting cases). In these cases, courts "construe[] the waiver as applying, at most, to

related claims seeking damages essentially for the same conduct—e.g., a discharge—that

constituted the core retaliation for the whistleblowing . . . . The Whistleblower statute was

obviously designed to broaden protection to vulnerable workers, not to force them to jettison

legitimate independent claims as a condition to invoking the statute." Bennett v. City of

Holyoke, 230 F. Supp. 2d 207, 220-21 (D. Mass. 2002), aff'd, 372 F.3d 1 (1st Cir. 2004).

　　　　Looking to the language of the statute and in light of the purpose of the Whistleblower

Act, courts have limited the application of this waiver in several circumstances relevant here.

First, "the statute only bars claims against the employer," not other employees. Mailloux v.

Town of Littleton, 473 F. Supp. 2d 177, 185 (D. Mass. 2007); see also Bolduc v. Town of

Webster, 629 F. Supp. 2d 132, 156-57 (D. Mass. 2009) ("Plaintiff could have proceeded against

the Town solely under Chapter 151B, without asserting a claim under the whistleblower statute.

Having elected, however, to assert a whistleblower claim, he is deemed by statute to have waived

any other statutory remedy. Nonetheless, his claim under Chapter 151B against Bergeron—who

was not his employer—is not affected by the waiver provision of ch[.] 149, § 185."); Bennett,

230 F. Supp. 2d at 221 ("Because of this limitation, one Superior Court Judge has dismissed

Whistleblower claims against individual defendants, but permitted the same individuals to be

named on separate counts that would otherwise be subject to waiver." (citing Fisher v.

Commonwealth, No. 010613, 2001 WL 1249650, at *2-3 (Mass. Super. Ct. Aug. 23, 2001))).

Second, the waiver only applies to alternative state claims—federal claims are plainly not

covered by the language of the statute. Bolduc, 629 F. Supp. 2d at 147 n.17 ("[W]hile initiation

of a whistleblower action may bar other state claims, the waiver of remedies does not extend to rights and remedies available under federal law. In addition, the whistleblower statute only bars claims against the employer." (citations omitted)). Third, any waived claims must relate to the Whistleblower retaliation claims. More specifically, a plaintiff "does not waive claims which are substantially separate from and independent of the cause of action to recover for the retaliatory action." Haddad v. Scanlon, No. 99-180, 1999 Mass. Super. LEXIS 272, *10 (Mass. Super. Ct. July 16, 1999); see also Connolly v. Woburn Pub. Schs., 659 F. Supp. 3d 92, 114 (D. Mass. 2023) ("By filing a complaint with a [Section] 185 claim, plaintiff waived all other statutory and common-law claims related to her retaliation claim."); McGinn v. Exec. Off. of Energy & Env't Affs., 496 F. Supp. 3d 541, 552 (D. Mass. 2020) ("The only limitation on the waiver provision is that it extends only 'to related claims seeking damages essentially for the same conduct . . . that constituted the core retaliation for the whistleblowing.'" (quoting Oberg v. City of Taunton, 972 F. Supp. 2d 174, 191 (D. Mass. 2013))). Finally, even dismissal of Section 185 claims will not defeat waiver, as "[t]he text of the statute provides that 'institution' of a private action waives state and commonlaw claims." Connolly, 659 F. Supp. 3d at 114 (citation omitted).

In light of the above, several of Plaintiffs' retaliation, aiding and abetting, and unlawful interference claims survive. First, Gaitor, Powell, and Sanz's retaliation claims in violation of 42 U.S.C. § 2000e-3(a) against the City survive, as federal claims are not waived according to the plain language of the statute. Second, Gaitor's claim against Castillo for unlawful aiding and abetting of discriminatory actions in violation of Mass. G.L. c. 151B, § 4(5) survives, as the waiver is only applicable for claims against the employer, in this case, the City of Boston. The same is true for the following claims: (1) Gaitor's claims against Peeples, Castillo, and Wright-Rivera, as well as Powell's claims against Peeples and Wright-Rivera, for retaliation in violation

24

of G.L. c. 151B, § 4(4); (2) Gaitor's claims against Peeples and Castillo, as well as Pitts, Powell, and Sanz's claims against Peeples, for unlawful interference with Plaintiff's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A).

Conversely, several claims against the City fall within the ambit of the statute—more specifically, Gaitor, Powell, and Sanz's claims against the City for retaliation in violation of G.L. c. 151B, § 4(4), as well as Gaitor, Pitts, Powell, and Sanz's claims against the City for unlawful interference with Plaintiff's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A). As these are state claims against the employer that are not "substantially separate from and independent of the cause of action to recover for the retaliatory action," they are waived and Defendants' Motion for Summary Judgement as to these claims is **GRANTED**.

### B.    State and Federal Discrimination Claims Based on Race

The City moves for summary judgment of Plaintiffs Gaitor, Pitts, and Powell's state and federal race discrimination claims in violation of Mass. G.L. c. 151B, § 4(1) and Title VII, 42 U.S.C. § 2000e-2(a)(1). Under both state and federal law, it is a violation to refuse to hire or employ, to terminate, or to discriminate against an individual based on race or color. See MASS. GEN. LAWS ch. 151B, § 4(1); 42 U.S.C. § 2000e-2(a)(1). More specifically, Plaintiffs here claim a violation based on discriminatory impact, as opposed to discriminatory treatment, which may "involve[] employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another." Lopez v. Commonwealth, 978 N.E.2d 67, 79 (Mass. 2012) (citing Sch. Comm. of Braintree v. Mass. Comm'n Against Discrimination, 386 N.E.2d 1251, 1254 (Mass. 1979)). Such discriminatory impact claims do not require a showing of discriminatory intent or motive. Id. (citation omitted).

Discrimination claims "shall be construed liberally for the accomplishment of its

purposes." Lopez, 978 N.E.2d at 77 (quoting MASS. GEN. LAWS ch. 151B, § 9). Thus, courts

"interpret the statutory language 'according to the intent of the Legislature ascertained from all

its words construed by the ordinary and approved usage of the language, considered in

connection with the cause of its enactment, the mischief or imperfection to be remedied and the

main object to be accomplished, to the end that the purpose of its framers may be effectuated.'"

Id. (quoting Garrity v. Conservation Comm'n of Hingham, 971 N.E.2d 748, 753 (Mass. 2012)).

These state and federal claims are analyzed under the same standard, as it is Massachusetts

courts' "practice to apply Federal case law construing the Federal anti-discrimination statutes in

interpreting G.L. c. 151B." Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994)

(citing Wheelock Coll. v. Mass. Comm'n Against Discrimination, 355 N.E.2d 309, 313-15

(Mass. 1976)).

Employment discrimination claims employ a burden-shifting framework and "[t]he

ultimate burden of persuasion always remains on the plaintiff." Cham v. Station Operators, Inc.,

685 F.3d 87, 94 (1st Cir. 2012). Importantly, as stated above, at the summary judgment stage,

"the moving party, 'has the burden of affirmatively demonstrating the absence of a genuine issue

of material fact on every relevant issue, even if [the party] would not have the burden on an issue

if the case were to go to trial.'" Sullivan, 825 N.E.2d at 529 (quoting Matthews, 686 N.E.2d at

1308).

In this burden shifting framework, the plaintiffs first must establish a prima facie claim of

discrimination. Cham, 685 F.3d at 93. To establish a prima facie case of disparate impact, as

opposed to disparate treatment, discrimination, "[f]irst, the plaintiff must identify the challenged

employment practice or policy, and pinpoint the defendant's use of it. Second, the plaintiff must

demonstrate a disparate impact on a group characteristic, such as race, that falls within the

protective ambit of [the statute].  Third, the plaintiff must demonstrate a causal relationship between the identified practice and the disparate impact."  E.E.O.C. v. S.S. Clerks Union, Loc. 1066, 48 F.3d 594, 601 (1st Cir. 1995) (citation omitted); see also Jones v. City of Boston, 752 F.3d 38, 46 (1st Cir. 2014).  Generally, this requires "a threshold showing of a significant statistical disparity and nothing more."  Ricci v. DeStefano, 557 U.S. 557, 587 (2009) (citation omitted).

In assessing the third element of Plaintiffs' prima facie case of discriminatory impact, the City claims "a 'robust causality requirement' protects defendants from 'being held liable for racial disparities they did not create.'"  [Dkt. 225 at 6, 8] (quoting Smith v. City of Boston, 144 F. Supp. 3d 177, 191 (D. Mass. 2015) (internal citations omitted)).  Although courts have not been explicit nor consistent in applying a "robust causality requirement" outside of the housing context, it is clear "the plaintiff must show that the [] violation had a 'direct causal link'" to the policy.  Compare Smith, 144 F. Supp. 3d at 191 (citing Tex. Dept. of Hous. & Comty. Affs v. Inclusive Comtys. Project, Inc., 576 U.S. 519, 542 (2015)) (mentioning the robust causality requirement), with Jones, 752 F.3d at 59 (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

If the plaintiffs successfully make a prima facie showing, the defendants may then rebut the showing by producing evidence that its policy or practice is "job related for the position in question and consistent with business necessity."  Ricci, 557 U.S. at 578 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  If the defendant produces such evidence, "a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs."  Id. (quoting 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) and (C)); see also Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975)

27

("If an employer does then meet the burden of proving that its tests are 'job related,' it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" (quoting <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 801 (1973)))

In the matter at hand, Plaintiffs claim three employment practices that have a disparate impact: (1) the Van Policy, (2) the return-to-work order and lack of COVID-19 protocols, and (3) the sharing of information with law enforcement. The Court will focus its analysis on the return-to-work order. As to the Van Policy, the Plaintiffs have not established a prima facie case. The Plaintiffs have failed to establish that there is any imbalance apart from the underlying demographics, as the Van Policy was applicable only to SOAR. To find otherwise would mean any action of SOAR managers would be subject to a disparate impact analysis. As to the third claim, insufficient facts, beyond conclusory statements, exist to support the belief that there was a new policy for the sharing of information with law enforcement.

Nonethless, a review of the evidence establishes that a reasonable factfinder could find the Plaintiffs have established a prima facie case for disparate impact. First, the Plaintiffs have identified a specific policy, namely the return-to-work order and lack of COVID-19 protocols. In March of 2020, the governor of Massachusetts ordered that all but essential workers should work from home in light of the declaration of a global pandemic. This included the OECs. According to the Plaintiffs, about three weeks later, in April 2020, Wright-Rivera held a Zoom call with the OECs, during which she discussed SOAR's COVID-19 protocols. Several OECs reacted negatively to the procedures, and according to the Plaintiffs, Wright-Rivera responded angrily, stating, "[s]ince you guys are so ungrateful, everyone is coming back to work."

Defendants dispute that this occurred. The OECs then were forced to return to work, before other BCYF departments, where they complained about the lack of COVID-19 protocols. As late as October 8, 2020, OECs continued to complain about the lack of protocols, particularly relative to other BYCF department, including those in the same building as SOAR. SOAR management is accused of saying that the City of Boston's protocols did not apply to SOAR and during a roll call meeting, Wright-Rivera stated, "do what you have to do" or take leave. Again, Defendants dispute that this occurred. Thus, the facts that underscore the specific policy clearly remain a genuine issue of material fact.

Turning to the next elements of the prima facie case, Plaintiffs specifically contrast this return-to-work order and lack of protocols with other BCYF and City departments, which did not suffer the same or similar issues, having consistent COVID-19 protocols and remote work policies. Further, Plaintiffs have sufficiently made "a threshold showing of a significant statistical disparity," which is all that is required. Ricci, 557 U.S. at 587. Plaintiffs have demonstrated that by April 2020, 26 of SOAR's approximate 31 employees were Black, yet only 30.24% of the City's employees and 39.32% of BCYF's employees, of which SOAR falls within, are Black. [Dkt. 243 at ¶¶ 9-10]. SOAR's return-to-work order and related COVID-19 protocols differed from the rest of the department, and thus, the causal connection between the alleged violation and the policy is plain.

Although Defendants do not argue that the return-to-work order or lack of COVID-19 protocols relative to other BCYF departments were a business necessity, the Court will consider the justification as to the Van Policy, which highlights SOAR management's considerations in the face of the pandemic. SOAR management claims that a Modified Outreach Strategy allowed continued contact with constituent neighborhoods, which was job related and consistent with

business necessity. It is plainly a genuine issue of material fact if that is the case. While Defendants claim the policy was to continue SOAR's work, connecting with gang-involved youth, Plaintiffs identify clear alternatives. Plaintiffs could have continued to work from home, while driving themselves to constituent neighborhoods, which it appears some did despite the Van Policy. Similarly, alternative venues were available for effective training, which the management team offered as an additional justification. Again, this genuine dispute should be left to a jury. Additionally, Defendants point to the fact that some OECs continued to use their own vehicles for outreach, which further undermines the business necessity of the return-to-work order. Finally, there appears to be no believable justification for the lack of COVID-19 protocols, as were adopted by other BCYF divisions when the agency fully returned to work.

In whole, genuine issues of material fact remain as to the disparate impact of the return-to-work orders and lack of COVID-19 protocols; thus, summary judgment of Plaintiffs Gaitor (Counts I and II), Pitts (Counts I and II), and Powell's (Counts I and II) state and federal race discrimination claims in violation of Mass. G.L. c. 151B, § 4(1) and Title VII, 42 U.S.C. § 2000e-2(a)(1) is **DENIED**.

### C.    State and Federal Claims for Failure to Accommodate a Disability

The City moves for summary judgment of Plaintiff Sanz's state and federal failure to accommodate a disability claims in violation of Mass. G.L. c. 151B, § 4(16) and 42 U.S.C. § 12111. Under state and federal law, it is a violation to terminate, refuse to rehire or promote, or otherwise discriminate against someone based on a disability if they are capable of performing the essential job functions with reasonable accommodation unless it can be shown that the accommodation would impose undue hardship. See MASS. GEN. LAWS ch. 151B, § 4(16); 42 U.S.C. § 12111. Of note, "[t]he Supreme Judicial Court of Massachusetts has indicated that

federal case law construing the [Americans with Disabilities Act ("ADA")] should be followed in interpreting the Massachusetts disability law." Ward v. Mass. Health Rsch. Inst., Inc., 209 F.3d 29, 33 n.2 (1st Cir. 2000) (citing Labonte v. Hutchins & Wheeler, 678 N.E.2d 853, 856 n.5 (Mass.1997); Wheatley, 636 N.E.2d at 268).

To make a claim for failure to accommodate a disability, a plaintiff must show "(1) she was disabled within the meaning of the ADA, (2) she was a 'qualified individual,' and (3) the defendant, despite knowing of her disability, 'did not reasonably accommodate it,'" causing the plaintiff some harm. Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 31 (1st Cir. 2019) (first citing Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 107 (1st Cir. 2005); and then quoting 42 U.S.C. § 12111(8)); see also Stratton v. Bentley Univ., 113 F.4th 25, 52 (1st Cir. 2024) (citing Alba v. Raytheon Co., 809 N.E.2d 516, 522 n.9 (2004) ("To prove her case, the plaintiff must show that [she] was a 'qualified handicapped person' capable of performing the essential functions of his job with reasonable accommodation; [she] requested such accommodation, and [the defendants] refused to provide it; and, as a result of this refusal, [s]he suffered some harm.")).

As to the first element, "[t]he ADA defines 'disability' as either (a) a physical or mental impairment which substantially limits one or more of an individual's major life activities; (b) a record of such impairment; or (c) being regarded as having such an impairment. . . . It is well established that the determination of whether a plaintiff has a disability must be made on a case-by-case basis." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 20 (1st Cir. 2004) (citing 42 U.S.C. § 12102([1])); see also 29 C.F.R. § 1630.2(g). As to the second element, "[u]nder the ADA, a 'qualified individual' is 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" Pena, 923 F.3d at 27 (quoting 42 U.S.C. § 12111(8)).

The third element of a failure to accommodate claim often garners much of the attention and litigation. To show that an employer knew of the disability, "[a]n accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012). An employer may make a showing that the accommodation requested was not reasonable, but "[a]n adequately supported denial of an accommodation request requires the employer 'to produce at least some modicum of evidence showing that the [requested accommodation] would be a hardship, financial or otherwise.'" Calero-Cerezo, 355 F.3d at 23 (quoting Ward, 209 F.3d at 37). Determining the reasonableness of an accommodation request often requires a dialogue between employee and employer. In fact,

> [t]he ADA's regulations state that "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual." The scope of the employer's obligation in this process is not crystal clear, but "[t]he employer has at least some responsibility in determining the necessary accommodation," since "the regulations envision an interactive process that requires participation by both parties." . . . [T]his interactive process "requires a great deal of communication between the employee and employer."

Id. at 23-24 (first quoting 29 C.F.R. § 1630.2(o)(3); and then García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648 n.12 (1st Cir. 2000)). As a result, "[t]here may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." Jacques v. Clean-Up Grp., Inc., 96 F.3d 506, 515 (1st Cir. 1996); see also Calero-Cerezo, 355 F.3d at 24 ("An employer's refusal to participate in the process may itself constitute evidence of a violation of the statute.").

In its Motion for Summary Judgment, the City does not dispute the first two elements—that Sanz was disabled within the meaning of the ADA and state law, and that Sanz is a qualified

person.  Instead, the Motion focuses on if Plaintiff's accommodation request was "sufficiently direct and specific" and if it explained "how the accommodation is linked to [P]laintiff's disability."  Jones, 696 F.3d at 89.

At issue, Sanz emailed Wright-Rivera, Peeples, and her direct supervisor, Robin Christian, stating: "Please receive this letter as a form of excuse to release me from any participation in regards to the city van.  However this is not me excusing myself from my Streetworker duties (outreach)."  The email included an attached letter from Sanz's doctor, Deborah Green, a clinical neuropsychologist at Brigham and Women's Hospital.  The letter stated: "Ms. Undini Sanz is currently in treatment for a mental health condition, which is exacerbated during times of stress, including the current COVID-19 crisis.  Please make every effort to accommodate her safety during this time, including excusing her from spending time in an enclosed space with other people (traveling by shared van)."  The City claims this email and attached letter is insufficient.

It is undisputed that the letter did not specifically identify the conditions that Sanz was being treated for, namely, anxiety, depression, and PTSD; however, it does not necessarily follow that the request was not sufficiently direct and specific.  The law does not say that the disability must be direct and specific, but instead, that the accommodation request must be direct and specific.  Here, both Sanz and her doctor articulated that because of mental health conditions, Sanz requested to not be in enclosed spaces, specifically identifying the Van Policy at issue.  Both Sanz and her doctor identify the Van Policy as directly tied to exacerbating her mental health conditions.  Even if not encompassing enough to conclude the accommodation request process, at the very least, the City was put on notice of Sanz's need for an accommodation and the City should have undertaken an interactive process, which requires a

33

"great deal of communication."  Instead, the City has only identified that Wright-Rivera replied to Sanz, saying "Thank you for sending this along.  I will forward it to Wascar to put in your file."  Castillo replied only to Wright-Rivera, saying: "Thank you Talia."  It then remains a disputed fact if Wright-Rivera continued to force Sanz to take the van in line with the Van Policy.  The City claims there is no "documentary evidence," but that is not required to establish a genuine issue of material fact—or to introduce evidence at trial, for that matter.  Instead, submissions of evidentiary quality include verbal testimony like depositions.  Edwards v. Commonwealth, 174 N.E.3d 1153, 1157 (Mass. 2021).  It is up to the trier of fact to determine the veracity of those statements.  Subsequently, absent the accommodation, Sanz claims her mental health worsened and Sanz was otherwise threatened with punishment.

As a result, there remains a genuine issue of material fact and summary judgment of Sanz's state and federal disability accommodation claims (Counts X and XI) is **DENIED**.

### D.    Retaliation Under Federal Law

The City moves for summary judgment of Plaintiffs Gaitor, Powell, and Sanz's federal retaliation claim in violation of 42 U.S.C. § 2000e-3(a).  Such a retaliation claim employs a similar burden-shifting framework as discrimination claims.  First, the plaintiff must make a prima facie showing that she (1) engaged in protected conduct; (2) suffered an adverse employment action; and (3) that there was a causal connection between the protected conduct and adverse employment action.  Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 36 (1st Cir. 2011); Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 115 (1st Cir. 2024) (explaining that a prima facie case requires a showing that: "(1) the plaintiff engaged in protected conduct, (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity").

Title VII defines two forms of protected conduct: "(1) participating in a Title VII proceeding; and (2) 'oppos[ing] any practice made an unlawful employment practice by [Title VII].'"  Kinzer, 99 F.4th at 115 (quoting 42 U.S.C. § 2000e-3(a)).  Importantly,

> [w]hile the statute does not define this latter category, the Supreme Court has construed the opposition clause broadly.  Thus, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity," and that act is protected so long as the conduct would "qualify in the minds of reasonable jurors as 'resistant' or 'antagonistic' to [the unlawful employment practice]."

Id. at 115-16 (quoting Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276-78, (2009)) (alterations in original).  The employee need not make a showing that the objected to conduct was actually a violation of Title VII.   Id. at 115.  Instead, "[o]ppositional conduct need only rest on a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'"  Id. (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009)).

Looking to the second element, in considering if there exists an adverse employment action, the Court will find any action is adverse, "which in this context . . . might have dissuaded a reasonable worker from" taking part in protected activity.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).  This is not a "categorical" determination, United States ex rel. Herman v. Coloplast Corp., 295 F. Supp. 3d 37, 43 (D. Mass. 2018) (citing Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 472 (1st Cir. 2010)), but "[i]nstead, whether a challenged action is materially adverse is 'an objective test and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"  Id. (quoting Lockridge, 597 F.3d at 472).

Turning to the third, causation, element, "temporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008) (quoting Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007)). This prima facie case "need not prove retaliation by a preponderance of the evidence." Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015). Instead, the plaintiff only needs to "raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action." Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 50 (1st Cir. 2010) (quoting Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000)).

If the plaintiff successfully makes a prima facie showing, the burden then shifts to the employer who must articulate a legitimate, non-retaliatory reason for the challenged actions; if successful, the plaintiff must then establish that the employer's explanation for the challenged action was pretext for retaliating. Billings v. Town of Grafton, 515 F.3d 39, 55 (1st Cir. 2008); see also Planadeball, 793 F.3d at 175 ("[T]he burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions."). If a plaintiff has "raised a genuine issue of material fact that the defendants' stated grounds for firing him [or her] were in fact a pretext for retaliatory animus," the plaintiff "necessarily has met the lesser burden that he bears at the prima facie stage of showing a causal connection between his protected conduct and the decision to fire him [or her]." Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 32 (1st Cir. 2015) (holding that the plaintiff had met his burden of persuasion to show pretext).

### 1.      Retaliation as to Gaitor

Gaitor claims several courses of protected conduct, including: (1) objecting to the age discrimination faced by Miller and others; (2) objecting to the lack of COVID-19 protocols and

the Van Policy, including refusing to use the van after his panic attack; (3) participation in the investigation into the use of "Snitching on All Residents," both as a Union representative and during his own interview; and, (4) the October 9 email regarding the lack of COVID-19 protocols. Each of these activities fulfills the requirements of oppositional conduct, relying on a good faith belief that the employer was violating Title VII. This is particularly true as several of these actions underscore the substantive elements for age and race discrimination, which even if they fail, can support a claim for retaliation.

Turning to the second element, Gaitor has claimed a series of adverse employment actions, including: (1) a one-day suspension in January 2020; (2) the loss of 70 hours of vacation time; (3) the increase in his workload while on probation as a Resource Coordinator; and, (4) his November 2020 termination. As an initial matter, the City claims that Gaitor only suffered two adverse employment actions, his one-day suspension and his termination. Thus, the nature of the adverse employment actions remains a genuine issue of material fact, particularly because a reasonable factfinder could find that each of these punishments could have dissuaded a reasonable worker from taking part in protected activity and therefore could be considered an adverse employment action. Finally, as to the third element, there exists enough evidence in the record to suggest causality based on the temporal proximity of the adverse actions, especially as to the suspension following his refusal to follow the Van Policy and use of a personal day, the increase of his workload, and his termination, which each closely followed the conduct described above.

Putting aside that the City disputes that more than two adverse employment actions exist, the City has identified legitimate non-discriminatory purposes for Gaitor's one-day suspension—his failure to follow CBA protocols to request a personal day—and his termination—his failure

to meet expectations as a Resource Coordinate and the provision of false statements. Thus, Gaitor must raise a genuine issue of material fact that these explanations are pretext for retaliatory action. The Court finds that Gaitor has done so sufficiently. First, as to the required protocols required by the CBA, it remains disputed if Gaitor actually failed to follow the appropriate CBA in place at the time. Second, Gaitor has identified that the City failed to justify its move directly to suspension, as opposed to the graduated sanctions prescribed by the CBA. Finally, as to his termination, Gaitor identified that his supervisor, Davo (David) Jefferson, had no issues with his performance and the City has not identified false statements that Gaitor provided during the investigation. Because of the above, Gaitor has raised a genuine issue of material fact as to the retaliatory pretext, and further, has "necessarily [] met the lesser burden that he bears at the prima facie stage of showing a causal connection between his protected conduct and the decision to fire him." Soto-Feliciano, 779 F.3d at 32. Considering the above, there remains a genuine issue of material fact and summary judgment of Gaitor's federal retaliation claim (Count VII) is **DENIED**.

### 2.    Retaliation as to Powell

A review of Powell's retaliation claim is a closer call. Powell's claimed protected conduct includes: (1) objecting to the discriminatory treatment of older and disabled workers; (2) claimed threats over a reasonable accommodations meeting; (3) requesting accommodation to the Van Policy; and, (4) the November 4 letter, as well as, according to his affidavit, the November 19 letter and subsequent meeting with Commissioner William Morales. Again, each of these activities fulfills the requirements of oppositional conduct. While the City claims that Powell has failed to provide documentary evidence of the protected activity, as described above, evidence gathered from depositions and affidavits are appropriately considered in resolving a

motion for summary judgment.  Turning to the second element, the City claims that there were no adverse employment actions, but the Court finds that this remains a genuine issue of material fact.  Specifically, Powell identifies several adverse employment actions, including the rejection of touchpoints provided to Powell's supervisor, an increase in the number of constituents for whom Powell was responsible, multiple written warnings immediately following Powell's objections to the Van Policy and lack of Covid-19 protocols, and again, an increase in required touchpoints following the mailing of the November letters.  Powell also identifies a written warning in April 2020 as an additional adverse employment action.  Without addressing the other adverse actions, the City claims that Powell's workload was not increased because everyone was required to complete the same touchpoints, regardless of the number of their constituents.  A reasonable factfinder could certainly find that increasing Powell's constituents and then leaving him to cover a neighborhood without any additional support following Pitts' FMLA leave, is an adverse employment action.

Even if touchpoints were the unit of measure assessed in the ETO, an OEC's failure to connect with their constituents, at the very least, would reflect negatively on SOAR.  To claim that reaching each constituent is not an aspect of job performance could only lead to the conclusion that SOAR was more focused on touchpoints than providing services to all community members.  Further, several of the Plaintiffs claimed that they did not receive the formal orientation explaining ETO provided by Defendants in their filings and thus believed touchpoints were *in addition* to reaching their constituents.  Powell also claimed that his touchpoints were increased or rejected relative to other employees who did not object.  Each of these claims are a genuine issue of material fact as to the second element.  Turning to the third element, the temporal proximity of several of these adverse actions justifies a finding that Powell

has reached the low bar of proving a prima facie case.  Subsequently, the City has not offered a legitimate, non-retaliatory explanation for their actions.  Thus, there remains a genuine issue of material fact and summary judgment of Powell's federal retaliation claim (Count VII) is **DENIED**.

### 3.    Retaliation as to Sanz

Sanz engaged in much of the same protected conduct as Powell, including: (1) objecting to the discriminatory treatment of older and disabled workers; (2) requesting accommodation to the Van Policy; and, (3) the drafting and mailing of the November letters.  She also experienced many of the same adverse employment actions, including an increase in workload and written warnings, among others.  In line with the above, Sanz has similarly established a prima facie case of retaliation and the City has failed to provide a non-retaliatory explanation.  As a result, there remains a genuine issue of material fact and summary judgment of Sanz's federal retaliation claim (Count XIII) is **DENIED**.

### E.    Retaliation Under Massachusetts State Law

Defendant Peeples, Castillo, Wright-Rivera, and the City, as to Plaintiff Gaitor; Defendant Peeples, Wright-Rivera, and the City, as to Plaintiff Powell; and the City, as to Plaintiff Sanz, move for summary judgment of the referenced Plaintiffs' state retaliation claim in violation of G.L. c. 151B, § 4(4).  Such a retaliation claim employs a nearly identical burden-shifting framework as the federal claim.  Of note, as explained above, Gaitor, Powell, and Sanz's claims against the City for retaliation in violation of G.L. c. 151B, § 4(4) have been waived, as the claims are not substantially separate from the Whistleblower action.

First, Plaintiffs must establish a prima facie case of retaliation by showing: "[(1)] [they] engaged in protected conduct, [(2)] that [they] suffered some adverse action, and [(3)] that 'a

40

causal connection existed between the protected conduct and the adverse action.'"  Mole v. Univ.
of Mass., 814 N.E.2d 329, 338-39 (Mass. 2004) (quoting Mesnick, 950 F.2d at 827).  Turning to
the first element, "a plaintiff has engaged in protected activity if 'he[or she] has opposed any
practices forbidden under [Chapter 151B] or . . . has filed a complaint, testified or assisted in any
proceeding under [G.L. c. 151B, § 5].'"  Mole, 814 N.E.2d at 338 n.13 (quoting MASS. GEN.
LAWS ch. 151B, § 4(4)).  Just as it was for the federal claim, "[t]he fact that a complaint is later
found to be unmeritorious does not preclude a retaliation claim based on the protected activity of
pursuing that complaint."  Id. (citing Mesnick, 950 F.2d at 827); see also Psy-Ed Corp. v. Klein,
947 N.E.2d 520, 530 (Mass. 2011) ("A claim of retaliation may succeed even if the underlying
claim of discrimination fails, provided that in asserting her discrimination claim, the claimant
can 'prove that [she] reasonably and in good faith believed that the [employer] was engaged in
wrongful discrimination.'"  (quoting Abramian v. President & Fellows of Harvard Coll., 731
N.E.2d 1075, 1087(Mass. 2000))).

　　Turning to the second element, "[u]nder G.L. c. 151B, § 4(4), adverse actions consist of a
defendant's action 'to discharge, expel or otherwise discriminate against' the plaintiff."  Mole,
814 N.E.2d at 339 n.14 (quoting MASS. GEN. LAWS ch. 151B, § 4(4)); see also Psy-Ed Corp., 947
N.E.2d at 530 ("[C]ourts use 'adverse employment action' as a convenient term of reference to
the more detailed statutory language when assessing, for example, whether actions taken by
employers were substantial enough to have materially disadvantaged an employee.").  In brief,
"[a]n adverse employment action is one that materially changes the conditions of a plaintiff's
employment."  McKeon v. Robert Reiser & Co., 770 F. Supp. 3d 351, 378 (D. Mass. 2025)
(internal quotation marks omitted) (quoting Desai v. Univ. of Mass. Mem'l Med. Ctr., 605 F.
Supp. 3d 255, 267 (D. Mass. 2022)).  Finally, as to the third element, a causal connection can be

evidenced in several ways, including where an "adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity." Psy-Ed Corp., 947 N.E.2d at 530 (internal quotation marks omitted) (quoting Mole, 814 N.E.2d at 339).

Subsequently, under the burden-shifting framework and just as above, if the plaintiff successfully makes a prima facie showing, the burden then shifts to the employer who must articulate a legitimate, non-retaliatory reason for the challenged actions; if successful, the plaintiff must then establish that the employer's explanation for the challenged action was pretext for retaliating. Mole, 814 N.E.2d at 338 (citing McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 309 (1st Cir. 1998) ("[I]n the wake of the defendants' introduction of nonretaliatory reasons for the various actions taken, [plaintiff has] the burden of proving that the articulated nonretaliatory reasons were pretext.")).

### 1.    Retaliation as to Gaitor

As the state retaliation claim employs the same burden shifting framework as the federal claim, the analysis above applies with equal force here. Thus, the Court finds that Gaitor has established a prima facie case, there exists a non-retaliatory motive, and Gaitor has provided sufficient evidence of pretext. Nonetheless, the Court must address the alternative defenses presented by the Defendants as they apply specifically to the state claims.

First, Defendants claim that Gaitor's state retaliation claim against Peeples must be dismissed because there is no evidence in the record that Peeples took an adverse action against the Plaintiff. Based on the evidence in the record, this Court disagrees. A reasonable factfinder could find that Peeples, the Strategy and Operations Manager and second-in-command of SOAR, had a hand in both caseload management and implementation of the Van Policy, which changed

Gaitor's conditions of employment.

Second, Defendants argue that Gaitor's state retaliation claim against Castillo must be dismissed because Castillo did not take action against Gaitor. This Court disagrees. A reasonable factfinder could find that Castillo, the Director of Human Resources for BCYF, was involved in the retaliation against Gaitor, as he was regularly involved in meetings with Wright-Rivera to determine disciplinary actions to be taken. Castillo was also involved in the investigation into the October email.

Third, and finally, Defendants argue that Gaitor's state retaliation claim against Wright-Rivera must be dismissed because the January 2020 suspension was not retaliatory. As described above, Gaitor has provided sufficient evidence that the non-retaliatory explanation was pretext, which remains a genuine issue of material fact.

Thus, there remains a genuine issue of material fact and summary judgment of Gaitor's state retaliation claim (Count VI) as to Peeples, Castillo, and Wright-Rivera is **DENIED**. The Motion as to the City is **GRANTED**, for the reasons stated above.

### 2.    Retaliation to Powell

The same reasons the claims against Peeples and Wright-Rivera survive as to Gaitor are applicable for Powell. First, Wright-Rivera was the claimed instigator of several of the listed adverse employment actions. Second, as described above, a reasonable factfinder could certainly find that Peeples, the Strategy and Operations Manager and second-in-command of SOAR, had a hand in both caseload management and initiation of the Van Policy.

As a result, there remains a genuine issue of material fact and summary judgment of Powell's state retaliation claim (Count VI) as to Peeples and Wright-Rivera is **DENIED**. The Motion as to the City is **GRANTED**, for the reasons stated above.

43

F.        **Unlawful Aiding and Abetting**

Defendant Castillo moves for summary judgment of Plaintiff Gaitor's unlawful aiding
and abetting of discriminatory actions claim in violation of Mass. G.L. c. 151B, § 4(5).  Section
4(5) makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid,
abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to
attempt to do so."  MASS. GEN. LAWS ch. 151B, § 4(5).  As a result, "individuals, including co-
employees of the allegedly aggrieved employee, are liable for violations of this section." Chapin
v. Univ. of Mass. at Lowell, 977 F. Supp. 72, 78 (D. Mass. 1997) (citing Ruffino v. State St.
Bank & Tr. Co., 908 F. Supp. 1019, 1048 (D. Mass. 1995)).  To make a claim under Section
4(5), a plaintiff must show three elements: "(1) that the defendant committed 'a wholly
individual and distinct wrong . . . separate and distinct from the claim in main[3]'; (2) 'that the
aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender';
and (3) that 'the aider or abetter knew of his or her supporting role in an enterprise designed to
deprive [the plaintiff] of a right guaranteed him or her under G.L. c. 151B.'" Lopez, 978 N.E.2d
at 82 (quoting Harmon v. Malden Hosp., 19 Mass. Discrimination L. Rep. 157, 158 (1997)).

There remain several disputes of material fact that are best left to the jury.  The claim for
aiding and abetting as to Castillo relies on a series of conversations leading to Gaitor's eventual
termination.  On October 9, Gaitor, along with several others, sent a supposedly anonymous
email to City officials.  On October 13, during an investigatory interview, Wright-Rivera learned
that Gaitor had access to the account that sent the email.  Gaitor denied writing the email for fear
of getting fired.  Castillo attempted to contact Gaitor several times over the next several weeks to

---

[3] Gaitor is required, in the complaint, "to allege the commission of an underlying act of discrimination under G.L. c.
151B (the 'main claim') by the principal offender." Lopez, 978 N.E.2d at 82 (citing Russell v. Cooley Dickinson
Hosp., Inc., 772 N.E.2d 1054, 1066 n.7 (Mass. 2002)).

discuss the email.  Around this time, in late October, Gaitor claims to have overheard a conversation between Wright-Rivera, Peeples, Castillo, and another BCYF official, during which he alleges Wright-Rivera and Peeples expressed a desire for him to leave the organization.

Castillo then reached out to Gaitor to discuss whether there was a "hostile environment at SOAR," and they spoke on November 2, 2020.  Again, Gaitor feared for his job and asked that the conversation remain confidential.  During the conversation, Castillo claims that Gaitor admitted to the existence of a hostile work environment at SOAR but denied complaining about it.  Nonetheless, Gaitor claims to have informed Castillo of Peeples' and Wright-Rivera's history of retaliation during this conversation.  Gaitor was fired the next day via a letter dated November 2, the same day as his conversation with Castillo.

As to the first element, the alleged sharing of information between Castillo and Wright-Rivera is an entirely separate act from the discriminatory and retaliatory acts that serve as the basis of Gaitor's other substantive claims.  As to the third element, in light of both his conversations with Wright-Rivera and Peeples, as well as his role as Director of Human Resources, there is certainly sufficient evidence for a reasonable juror to find that Castillo was aware of the "enterprise to deprive" Gaitor of his employment.

Finally, as to the second element, it remains a genuine issue of material fact that that Castillo shared the requisite intent to discriminate.  Castillo claims there is no evidence in the record that Castillo ever communicated with Wright-Rivera following his conversation with Gaitor.  Castillo also claims that during the conversation that Gaitor overheard between Wright-Rivera, Peeples, Castillo, and another BCYF official, they were already openly discussing Gaitor's termination.  This remains in dispute as Gaitor only claims to have overheard a desire for him to leave the organization.  As to the lack of evidence in the record that Castillo

45

communicated with Wright-Rivera, the circumstances of Gaitor's firing weigh strongly in favor of a shared intent to discriminate. Gaitor claims that Castillo had been attempting to speak to him regarding his claims of discrimination and retaliation for weeks. Then, within a single day of the conversation between Gaitor and Castillo, Gaitor was terminated via a letter dated the same date as the conversation. The timing of the termination is strong circumstantial evidence. Cf. Kinzer, 99 F.4th at 117 ("As for causation, the timing of [plaintiff]'s termination 'alone [is] suffic[ient] to meet the relatively light burden of establishing a prima facie case of retaliation.'" (quoting DeCaire, 530 F.3d at 19 (internal quotation marks omitted))). This finding is further supported by the maxim that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and *intent*." Santiago-Ramos, 217 F.3d at 54 (emphasis added) (citing Hodgens, 144 F.3d at 167); see also Sullivan, 825 N.E.2d at 529 ("[T]he question of the employer's state of mind (discriminatory motive) is 'elusive and rarely is established by other than circumstantial evidence.'" (quoting Blare, 646 N.E.2d at 114).

Thus, there remains a genuine issue of material fact and summary judgment of Gaitor's aiding and abetting claim (Count VIII) is **DENIED**.

### G. Unlawful Interference

Defendant Peeples, Castillo, and the City, as to Plaintiff Gaitor, as well as Defendant Peeples and the City, as to Plaintiffs Powell, Sanz, and Pitts, move for summary judgment of the referenced Plaintiffs' unlawful interference claims in violation of Mass. G.L. c. 151B, § 4(4A). As an initial matter, as explained above, Gaitor, Powell, Sanz and Pitts' claims against the City for retaliation in violation of G.L. c. 151B, § 4(4A) have been waived, as the claims are not substantially separate from the Whistleblower action.

Under Section 4(4A), it is unlawful for "any person to coerce, intimidate, threaten, or

interfere with another person in the exercise or enjoyment of any right granted or protected by

[M.G.L. c. 151B], or to coerce, intimidate, threaten or interfere with such other person for having

aided or encouraged any other person in the exercise or enjoyment of any such right granted or

protected by [M.G.L. c. 151B]." Coogan v. FMR, LLC, 264 F. Supp. 3d 296, 309 (D. Mass.

2017) (quoting MASS. GEN. LAWS ch. 151B, § 4(4A)). Section 4(4A) "independently and

explicitly provides for an interference claim, not merely against employers, but against all

'person[s].'" Lopez, 978 N.E.2d at 77 (internal quotation marks omitted) (quoting Thomas

O'Connor Constructors, Inc. v. Mass. Comm'n Against Discrimination, 893 N.E.2d 80, 91

(Mass. App. Ct. 2008) (Rubin, J., concurring in the judgment and dissenting in part));

McLaughlin v. City of Lowell, 992 N.E.2d 1036, 1058 n.34 (Mass. App. Ct. 2013) (internal

quotation marks omitted) ("By including [Section] 4(4A) in c. 151B, the Legislature intended to

extend the statute's reach beyond employer-employee interactions to encompass discriminatory

conduct by third parties to which an employee could be subjected." (quoting Mass. Comm'n.

Against Discrimination vs. Thomas O'Connor Constructors, MCAD, No. 98-BEM-3762 (Jan.

21, 2005))). Although applicable to any "person," the Commonwealth, and by extension, SOAR,

"has consented to suit under § 4(4A) . . . by including the Commonwealth and its

instrumentalities in the statutory definition of 'person.'" Lopez, 978 N.E.2d at 74.

　　　　Relevant to the case at hand, "[a]mong the rights protected by G.L. c. 151B is the right to

be free from discrimination in the terms, conditions, and privileges of employment . . . ." Id. at

707; Araujo v. UGL Unicco-Unicco Operations, 53 F. Supp. 3d 371, 383 (D. Mass. 2014)

("There is no question that G.L. c. 151B, § 4(4A), prohibits interference with an employee's

right to work in an environment free of unlawful [race] discrimination." (quoting McLaughlin,

992 N.E.2d at 1057 (internal quotation marks omitted))); Coll.-Town, Div. of Interco, Inc. v.

Mass. Comm'n Against Discrimination, 508 N.E.2d 587, 591 (Mass. 1987) ("A work environment pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, poses a formidable barrier to the full participation of an individual in the workplace."); Thomas O'Connor Constructors, Inc., 893 N.E.2d at 87 ("[T]he right to work in an environment free from unlawful racial harassment is unquestionably among the rights encompassed by the statute."). In assessing such a workplace, liability can rest on claims of either direct discrimination or retaliation. See Lopez, 978 N.E.2d at 78 (citing Pontremoli v. Spaulding Rehabilitation Hosp., 747 N.E.2d 1262, 1262, 1263-64, 1264 n.4 (Mass. App. Ct. 2001)). Importantly, discrimination may be shown both by evidence of disparate impact or a passive acceptance of a hostile work environment.

Additionally, "[a]n employer who passively tolerates the creation of a hostile working environment implicitly ratifies the perpetrator's misconduct and thereby encourages the perpetrator to persist in such misconduct . . . ." Mod. Cont'l/Obayashi v. Mass. Comm'n Against Discrimination, 833 N.E.2d 1130, 1138 (Mass. 2005). As a result, courts have found that when an employer is on notice of unlawful discriminatory acts and fails to take "adequate remedial action," the employer is liable under Section 4(4A). Thomas O'Connor Constructors, Inc., 893 N.E.2d at 89.

Finally, as stated above, Section 4(4A) "shall be construed liberally for the accomplishment of its purposes." MASS. GEN. LAWS ANN. ch. 151B, § 9. To this end, while an interference claim must rely on intentional conduct, "it is not necessary that a plaintiff allege that such interference not only was intentional, but was undertaken with a specific intent to discriminate." Lopez, 978 N.E.2d at 78-79.

### 1.    Unlawful Interference as to Peeples

Turning to the Plaintiffs' claims of unlawful interference as to Peeples, it is certainly true that Peeples was a participant in many of the claims of discrimination and retaliation described above.  With that said, Peeples was most obviously a participant in a claim not discussed above: Gaitor, Pitts, and Powell's claims of age discrimination.  Again, as described above, to make out a claim of unlawful interference, the Plaintiffs must show Peeples interfered with another person's rights protected by Chapter 151B, which includes discrimination based on age in violation of G.L. c. 151B, § 4(1C).  The Plaintiffs must show that Peeples either exhibited purposeful conduct that interfered in the Plaintiffs' enjoyment of a workplace free from discrimination, in this case age discrimination, or "passively tolerate[d] the creation of a hostile working environment implicitly ratif[ying] the perpetrator's misconduct and thereby encourag[ing] the perpetrator to persist in such misconduct . . . ."  Mod. Cont'l/Obayashi, 833 N.E.2d at 1138.

The City has not moved for summary judgment as to Gaitor, Pitts, and Powell's age discrimination claims, which remain active in the suit.  Cf. McLaughlin, 992 N.E.2d at 1058 ("Absent actionable discriminatory conduct, there exists no basis on which to ground a claim of interference.").  Each of the Plaintiffs here have alleged either intentional conduct that Peeples would have known interfered with their ability to operate in a workplace absent age discrimination or that Peeples was aware of the environment in which age discrimination festered and thereby encouraged its continuation.  According to Gaitor, after observing Wright-Rivera and Peeples' discriminatory treatment of Miller, he spoke to Peeples about their conduct, ensuring that Peeples was on notice.  [Dkt. 243 at ¶¶ 60, 62].  Pitts claims he heard Peeples and Wright-Rivera make disparaging comments about older employees, including encouraging those

above the age of 40 to quit, calling them "deadweight" and threatening to work them until they quit. [Dkt. 246 at ¶¶ 11-16]. Powell claims Peeples and Wright-Rivera tried to "get older workers to leave" and he raised these concerns to a union representative. [Dkt. 247 at ¶¶ 19-22]. Finally, Sanz claims to have heard Peeples and Wright-Rivera make "inappropriate remarks" about older workers and eventually alerted Shawn Webb, a former Streetworker manager, to these statements. [Dkts. 243 at ¶ 11, 249 at ¶ 7]. After Sanz complained of discrimination in 2020, she claims her caseload increased from 15 to 63 constituents. [Dkt. 243 at ¶¶ 77]. The Defendants dispute that this conduct occurred. Each of these facts, if true, would be sufficient to form the basis of a claim for unlawful interference, and thus there remains a genuine issue of material fact on which a reasonable factfinder could find in favor of the Plaintiffs. See Thomas O'Connor Constructors, Inc., 893 N.E.2d at 89 ("[Defendant]'s remarks intimidated, humiliated, and stigmatized [plaintiff] and other workers of his race in such a way as to pose a 'formidable barrier to the full participation of an individual in the workplace.'" (quoting College–Town, 508 N.E.2d at 591)). Thus, the unlawful interference claims as to Peeples must survive.

### 2.    Unlawful Interference as to Castillo

The remaining unlawful interference claim is Gaitor's claim as to Castillo. For the same reason that Gaitor's aiding and abetting of discrimination claim must survive, so too must Gaitor's claim against Castillo for unlawful interference. As stated above, the second clause of Section 4(4A) punishes any person who interferes with another person who aided or encouraged any other person in the exercise of the rights protected by Chapter 151B. Sufficient facts exist in the record that Castillo shared information Gaitor asked to keep confidential regarding the hostile work environment reinforced by SOAR's management. Based on the timing of Gaitor's firing— the very next day—this action interfered with Gaitor's ability to stay in a workplace absent

discrimination and retaliation.  This is disputed by Castillo and remains a genuine issue of material fact.

Thus, there remain genuine issues of material fact and summary judgment of Gaitor's (Count IX) unlawful interference claim as to Peeples and Castillo, and Powell (Count IX), Sanz (Count XIV), and Pitts' (Count VIII) unlawful interference claims as to Peeples are **DENIED**. The Motions as to the unlawful interference claims against the City is **GRANTED**, for the reasons stated above.

### H.  Massachusetts Whistleblower Claims

The City moves for summary judgment of Plaintiffs Powell and Sanz's retaliation claims in violation of the Massachusetts Whistleblower Act, Mass. G.L. c. 149, § 185(b)(1), as well as Plaintiffs Gaitor, Powell, and Sanz's retaliation claims in violation of the Massachusetts Whistleblower Act, Mass. G.L. c. 149, § 185(b)(3).  Section 185(b)(1) protects against an employer that takes retaliatory action against an employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or public utility employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment."  MASS. GEN. LAWS ch. 149, § 185(b)(1). Conversely, Section 185(b)(3) protects against an employer that takes retaliatory action against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment."  Id. § 185(b)(3).  The fundamental difference between Section 185(b)(1) and Section 185(b)(3) is the employee's level of involvement.  Section 185(b)(1) "contemplates

misconduct, in which the employee may be, but need not be, involved." Cristo v. Worcester

Cnty. Sheriff's Off., 156 N.E.3d 225, 231 (Mass. App. Ct. 2020) (citing Bennett, 362 F.3d at 3,

6).  Whereas Section 185(b)(3) "contemplates misconduct in which the employee is personally

involved, or in which the employee is asked to participate." Cristo, 156 N.E.3d at 231 (citing

Quazi v. Barnstable Cnty., 877 N.E.2d 273, 275, 276 (Mass. App. Ct. 2007)).  This distinction is

reinforced by another difference between the claims: "To qualify for protection under [S]ection

185(b)(1), but not under [S]ection 185(b)(3), an employee must first 'br[ing] the activity, policy

or practice . . . to the attention of a supervisor of the employee by written notice and . . . afford[]

the employer a reasonable opportunity to correct the activity, policy or practice'" before

disclosing to an outside body.  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 303 (1st Cir. 2014)

(quoting MASS. GEN. LAWS ch. 149, § 185(c)(1)).

Otherwise, both Sections 185(b)(1) and 185(b)(3) employ a similar burden-shifting

framework, beginning with a prima facie showing of retaliation.  Importantly, "we keep in mind

that the prima facie case is 'a small showing that is not onerous and is easily made.'" Che v.

Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003) (quoting Kosereis v. Rhode Island, 331

F.3d 207, 213 (1st Cir. 2003)).

A prima facie case under Section 185(b) requires a showing that: "(1) the plaintiff-

employee engaged in an activity protected by the act; (2) the protected activity was the cause of

an adverse employment action, such that the employment action was retaliatory; and (3) the

retaliatory action caused the plaintiff damages." Edwards, 174 N.E.3d at 1166.  When engaging

in the protected activity, both (b)(1) and (b)(3) require the employee to disclose (or threaten to

disclose), as to (b)(1), or to object (or refuse to participate), as to (b)(3), to an "activity, policy or

practice" the employee "reasonably believes is in violation of a law, or a rule or regulation

promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment." MASS. GEN. LAWS ch. 149, §§ 185(b)(1), (b)(3).

Importantly, "whether the plaintiff reasonably believed that [the action] was illegal 'is a genuine issue of material fact to be resolved by the trier of fact,'" Edwards, 174 N.E.3d at 1167 (citing Mailloux, 473 F. Supp. 2d at 185), and "[t]he plaintiff does not need to prove that any illegal conduct was actually taking place, it is sufficient if the employee had a reasonable belief that such illegal conduct was occurring." Amirault v. City of Malden, 335 F. Supp. 3d 111, 120 (D. Mass. 2018) (citing Mello v. Stop & Shop Cos., Inc., 524 N.E.2d 105, 108 n.6 (Mass. 1988)).

Of note, both Sections 185(b)(1) and 185(b)(3) cover whistleblowing regarding employer behavior that the employee reasonably believes poses a risk to public health, safety or the environment. More specifically, courts have found that discriminatory practices, as well as the sanction of discriminatory action, "would constitute either a 'violation of law' or an 'activity, policy, or practice' that plaintiff could reasonably believe posed a risk to public safety." Bolduc, 629 F. Supp. 2d at 154.

In turning to the second element, the statute defines a "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." MASS. GEN. LAWS ch. 149, § 185(a)(5). Additionally, "the protected activity" must be "the cause" of the adverse employment action. Courts consistently require a showing that "discriminatory animus was a 'determinative' or 'but for' cause of an adverse employment action, even if it was not 'the only cause.'" Edwards, 174 N.E.3d at 1168 (quoting Lipchitz v. Raytheon Co., 751 N.E.2d 360, 370-71, 371 n.19 (Mass. 2001)). Plaintiffs can offer evidence of this discriminatory animus in several ways, "including but not limited to, 'differential treatment in the workplace[,] . . . temporal proximity

of an employee's protected activity to an employer's adverse action[,] . . . or comments by the employer which intimate a retaliatory mindset.'"  Amirault, 335 F. Supp. 3d at 121 (quoting Ortiz v. Fed. Bureau of Prisons, 290 F.Supp.3d 96, 107 (D. Mass. 2017).  A plaintiff could also provide evidence that an adverse action was taken against a satisfactorily performing employee in the immediate aftermath of the employer's discovery of the protected conduct, Mole, 814 N.E.2d at 339, or disparate treatment "in the time period between the protected activity and the adverse employment action . . . ."  Che, 342 F.3d at 38 (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir.1997) ("[W]here there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference [that a causal connection exists].")).  In brief, "[t]he 'ultimate issue' is 'whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact' as to whether the adverse job action was causally related to" the protected activity.  Amirault, 335 F. Supp. 3d at 122 (quoting Dominguez-Cruz, 202 F.3d at 431).

        Generally, assessing if the protected activity was determinative of the adverse employment action is a genuine issue of material fact best left for a jury.  Edwards, 174 N.E.3d at 1169 (citation omitted).  Again, "[i]n cases where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate."  Flesner, 575 N.E.2d at 1110 (citing Pederson v. Time, Inc., 532 N.E.2d 1211, 1213 (Mass. 1989) ("[T]he generally accepted rule is that the granting of summary judgment in a case where a party's state of mind . . . constitutes an essential element of the cause of action is disfavored."  (internal quotation marks omitted)); see also Santiago-Ramos, 217 F.3d at 54 ("[C]ourts should exercise particular caution before granting summary judgment for employers on such issues as pretext,

motive, and intent." (citation omitted); <u>Sullivan</u>, 825 N.E.2d at 529 ("[T]he question of the employer's state of mind (discriminatory motive) is 'elusive and rarely is established by other than circumstantial evidence.'" (quoting <u>Blare</u>, 646 N.E.2d at 114)).

Just as in analyzing the other retaliatory claims, both Sections 185(b)(1) and (b)(3) employ a burden shifting framework. Assuming sufficient evidence of a prima facia case, "the employer 'may subsequently avoid liability by proffering a legitimate, nonretaliatory reason for the adverse action.' Once this has been shown, the ultimate burden rests with the employee to show that the employer's reason is pretextual and that a 'retaliatory animus sparked' the adverse action." <u>Amirault</u>, 335 F. Supp. 3d at 120 (quoting <u>Pierce</u>, 741 F.3d at 303). Once a prima facie case exists "and the question becomes one of pretext and animus, the First Circuit warns that 'courts must be particularly cautious about granting the employer's motion for summary judgment.'" <u>Coloplast Corp.</u>, 295 F. Supp. 3d at 45 (quoting <u>Hodgens</u>, 144 F.3d at 167).

### 1.    Section 185(b)(1)

As stated above, in addition to capturing different protected activity, the greatest distinction between the claims is Section 185(b)(1) does not protect "an employee who makes a disclosure to a public body unless the employee has brought the activity, policy or practice in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment, to the attention of a supervisor of the employee by written notice and has afforded the employer or public utility employer a reasonable opportunity to correct the activity, policy or practice." MASS. GEN. LAWS ch. 149, § 185(c)(1); <u>see also</u> <u>Pierce</u>, 741 F.3d at 303; <u>Bolduc</u>, 629 F. Supp. 2d at 153-54. For these purposes, a public body includes, "(A) the United States Congress, any state legislature, including the general court, or any popularly elected local government body, or any member or

employee thereof; (B) any federal, state or local judiciary, or any member or employee thereof, or any grand or petit jury; (C) any federal, state or local regulatory, administrative or public agency or authority, or instrumentality thereof; (D) any federal, state or local law enforcement agency, prosecutorial office, or police or peace officer; or (E) any division, board, bureau, office, committee or commission of any of the public bodies described in the above paragraphs of this subsection."  MASS. GEN. LAWS ch. 149, § 185(a)(3).

Although some courts have accepted written notice as a blanket requirement, other state and federal courts have interpreted the statute such that written notification is only required if the employee makes a disclosure to a public body, apart from the filing of a lawsuit, as opposed to the employee's supervisor.  Stuart v. City of Gloucester, No. 18-CV-11877-ADB, 2021 WL 4477476, at *12 (D. Mass. Sept. 30, 2021) ("The written disclosure requirement . . . applies only before an employee brings misconduct to the attention of a public body, not before an employee brings misconduct to the attention of a supervisor."); Cristo, 156 N.E.3d at 233 ("[I]t is apparent that an oral disclosure to a supervisor is protected outright against retaliation; the requirement of written notice and an opportunity to correct is imposed where the disclosure is to an outside public body."); but see Dirrane v. Brookline Police Dep't, 315 F.3d 65, 73 (1st Cir. 2002) ("[T]he state court in which [Plaintiff] filed his lawsuit was a public body and thus he was required to give written notice before filing suit.  Under the literal language of the statute, the town is correct; the statute defines 'public bodies' to include 'any federal, state, or local judiciary.'"  (quoting MASS. GEN. LAWS ch. 149, § 185(a)(3)).  Cristo explained, "[i]f an employer violates the act by retaliating against the employee for his disclosure, the employee has a cause of action. The fact that the employee then files a lawsuit does not magically cause the

employer's illegal retaliation to retroactively become lawful."[4]  156 N.E.3d at 233.

### a.    Section 185(b)(1) as to Powell

Looking at the first element, there is little question that Powell engaged in activity protected by the act in the sending of the October 9 Letter, which specifically identifies a series of BCYF COVID-19 protocols SOAR was failing to follow, as well as the November 4 and November 19 letters, which again identify a failure to follow COVID-19 protocols and identify both a fear of retaliation and a hostile work environment created by SOAR management.  Powell then met with William Morales, the Commissioner of BCYF, during which he admitted to drafting at least parts of the letter(s).  These letters fall within the ambit of 185(b)(1) regarding both a policy or practice in violation of law (retaliation and discrimination), as well as a risk to public health and safety, as the risk of COVID-19 infection not only impacted SOAR workers, but also the health of the constituents they interacted with and the community writ large. Additionally, this disclosure did not violate the requirement of written notice, as the disclosure was made internally, as SOAR is a division of BCYF, and by extension, the City of Boston. Further, the written notice predated any disclosure to an outside body, even if required before the start of the instant lawsuit.

Turning to the second element, although the City argues that Powell did not suffer an adverse employment action, this Court finds that remains a genuine issue of material fact best left to the jury.  Powell claims both that after the October 9 letter was sent, his touchpoints were

---

[4] The court added, "[w]e confirm (as was implicit in Quazi[, 877 N.E.2d at 276]) that, in our view, Dirrane[, which states that the filing of a lawsuit is a disclosure to a public body requiring prior written notice,] does not reflect Massachusetts law in this regard. . . . [P]rinciples of comity compel us to speak clearly, for the benefit of our Federal colleagues." Cristo, 156 N.E.3d 225 at 233 & n.5 (citing Cullinane v. Uber Techs., Inc., 893 F.3d 53, 61 (1st Cir. 2018) (discretionarily applying precedent of Massachusetts Appeals Court in absence of Supreme Judicial Court precedent)); Saunders v. Town of Hull, 874 F.3d 324, 332 (1st Cir. 2017) ("[T]he [Quazi] court's reasoning directly conflicted with a key assumption of Dirrane, and its progeny . . . .").

doubled, which the City disputes, and after remaining on what the City calls "leave" he was told he would need to reapply for his position. A reasonable juror could find that an increased workload or being forced to reapply for a position for which an employee is on leave is an adverse action related to the discharge or demotion of an employee or having had an otherwise adverse impact on the employee's terms and conditions of employment.

Finally, as to the third element and to repeat, "[t]he 'ultimate issue' is 'whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact' as to whether the adverse job action was causally related to" the protected activity. Amirault, 335 F. Supp. 3d at 122 (quoting Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000)). Generally, assessing if the protected activity was determinative of the adverse employment action is a genuine issue of material fact best left for a jury. Edwards, 174 N.E.3d at 1169 (citation omitted). The Court finds that Powell has introduced sufficient evidence to create a genuine issue of material fact as to causation.

First, the temporal proximity of the claimed increase in workload following the letters is sufficient to raise a genuine issue of material fact. Even if Powell's name was not on the letters, there is evidence in the record that Powell consistently complained about the lack of COVID-19 protocols. This includes an October meeting, immediately before the October 9 letter was sent, during which OECs directly confronted Wright-Rivera about the lack of COVID-19 protocols. The letter was written and sent immediately after this meeting. This is sufficient circumstantial evidence that the City was aware that Powell was part of the drafting and circulation of the letters. Second, Powell did admit, and subsequently attached his name, to the letters during and following his meeting with the Commissioner. The City claims there was no adverse

58

employment action following these revelations, but this fails to assess Powell's claim that he was told he would need to reapply for his position despite being on what both he, and the City, identified as various forms of leave. At the point he would need to reapply, the City was certainly aware of his Whistleblowing activity. As stated above, a plaintiff can provide evidence that an adverse action was taken against a satisfactorily performing employee in the immediate aftermath of the employer's discovery of the protected conduct. <u>Mole</u>, 814 N.E.2d at 339. This necessarily must be qualified by the fact that the adverse action can only happen at the earliest opportunity. <u>Cf.</u> <u>Velazquez-Garcia</u>, 473 F.3d at 19-20 ("[Plaintiff] should not escape liability for making the tactical decision to wait . . . ."). As Powell was on leave, the earliest opportunity for an adverse employment action was his attempted return. Thus, the Court finds that there is a genuine issue of material fact as to the causal connection between the whistleblowing activity and the adverse action. Powell's claim under Section 185(b)(1) must survive.

### b.    Section 185(b)(1) as to Sanz

Turning to Sanz's claim under the same provision, she took part in the same protected conduct as Powell.

Looking to the second element, contrary to the City's assertion, it remains a genuine issue of material fact that Sanz suffered an adverse employment action. Sanz argues that when she returned from leave in February 2021, immediately after the sending of the letters, Sanz was told by a constituent that she was in danger if she continued to return to the Heath Street community. In response, Sanz asked to be assigned to another community. According to Sanz, in retaliation for her participation with the letters, management refused to heed her safety concerns by reassigning her to a different neighborhood. Because of the resulting continued fear and anxiety, Sanz subsequently applied to go on FMLA leave in July 2021. Again, a reasonable juror could

find that the refusal of SOAR's management to reassign Sanz from a neighborhood where she believed she was in danger and her resultant leave, even though it was paid leave, see Coloplast Corp., 295 F. Supp. 3d at 42-43, is an adverse action that would impact the terms and conditions of Sanz's employment.

Finally, the temporal proximity of the adverse actions with the protected conduct would seem to support, at least insofar as necessary to create a genuine issue of material fact, that the protected activity was a determinative cause of the adverse action.

In light of the above there remains genuine issues of material fact and summary judgment of Powell (Count X) and Sanz's (Count I) claims under Section 185(b)(1) is **DENIED**.

### 2.    Section 185(b)(3)

As written above, Section 185(b)(3) protects against an employer that takes retaliatory action against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment."  MASS. GEN. LAWS ch. 149, § 185(b)(3).  Although Section 185(b)(3) follows the same burden-shifting framework as Section 185(b)(1), there are differences in the conduct protected.  While it does appear that "a plaintiff must have some level of personal involvement to state a claim under Section 185(b)(3)," Jakuttis v. Town of Dracut, 656 F. Supp. 3d 302, 335 (D. Mass. 2023) (citation omitted), it also appears that "supporting and corroborating . . . objections to [discriminatory] behavior . . . is sufficient to fall within the statutory language[ of Section 185(b)(3)]."  Bolduc, 629 F. Supp. 2d at 154.

### a.    Section 185(b)(3) as to Powell

The same operative facts support Powell's claim under both Sections 185(b)(1) and

185(b)(3). As Powell's Section 185(b)(1) claim survives the instant Motion for Summary Judgment, the only remaining question is if the identified protected activity includes some level of personal involvement. The answer is that it does. In the Letters, Powell identified and objected to both participating in work without following appropriate, city-mandated COVID-19 protocols, which put the public at risk. Powell also objected to the hostile work environment, which included Powell's refusal to discriminate against other older and disabled workers. There is not only evidence that Powell was directly asked to violate COVID-19 protocols to complete his work, to which he objected, but the Letters also supported and corroborated otherwise violative behavior. As a result, Powell's Section 185(b)(3) claim must survive.

### b.    Section 185(b)(3) as to Sanz

The same operative facts underscore Sanz's claim under both Sections 185(b)(1) and 185(b)(3). As Sanz's Section 185(b)(1) claim survives the instant Motion for Summary Judgment, the only remaining question is if the identified protected activity includes some level of personal involvement. For the same reasons as identified in the analysis of Powell's claim, Sanz also fulfills the personal involvement requirement and her claim must survive.

### c.    Section 185(b)(3) as to Gaitor

Gaitor's claim under Section 185(b)(3) follows a similar, although potentially even more obvious, set of facts as both Powell and Sanz. In early October, Gaitor was among the OECs that complained about working in an environment that failed to follow the COVID-19 protocols set by BCYF. Gaitor was then a primary author of the October 9 Letter that was sent to City officials identifying the COVID-19 protocols that OECs were forced to violate to do their jobs. The City immediately began investigating the origin of the letter and on October 13, during an investigatory interview, Wright-Rivera learned that Gaitor had access to the account that sent the

61

email.  Gaitor denied writing the email for fear of getting fired.  Castillo attempted to contact Gaitor several times over the next several weeks to discuss the email.  During a conversation that Gaitor asked to remain confidential, Castillo asked Gaitor about his belief that there was a hostile environment at SOAR.  Gaitor was fired the next day via a letter dated November 2, the same day as his conversation with Castillo.

Looking at the first element, the sending of the October 9 Letter falls within protected activity for the same reasons laid out in assessing Powell's Whistleblower claims.  The October 9 Letter objects to a risk to public health and safety, as the risk of COVID-19 infection not only impacted SOAR workers, but also the health and safety of the constituents they interacted with and the community writ large.

As to the second element, Gaitor suffered the most archetypal of adverse employment actions—termination.

As to the third element, Gaitor has offered sufficient evidence to create a genuine issue of material fact that the protected activity was determinative of the adverse employment action. The Letter was sent on October 9.  The City confirmed Gaitor's involvement on October 13, immediately after which Castillo, the Director of Human Resources for BCYF, began reaching out for a meeting with Gaitor.  Gaitor and Castillo met on November 2 and Gaitor was terminated the very next day.  The temporal proximity of these events is sufficient to raise a genuine issue of material fact as to this causation.

Finally, for the same reasons as Powell and Sanz, Gaitor's objection to the COVID-19 protocols was sufficient to fulfill the requirement for personal involvement.  As stated above, there is not only evidence that Gaitor was directly asked to violate COVID-19 policies to complete his work, to which he objected, but the October 9 Letter also supported and

corroborated otherwise violative behavior.  As a result, Gaitor's Section 185(b)(3) claim must survive.

There remains genuine issues of material fact and summary judgment of Gaitor (Count XI), Powell (Count XI), and Sanz's (Count II) whistleblower claims under 185(b)(3) are **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Partial Motion for Summary Judgment on Complaint of Jamaine Gaitor [Dkt. 220] is **GRANTED IN PART** and **DENIED IN PART**; Defendants' Partial Motion for Summary Judgment on Complaint of Stephen Powell [Dkt. 221] is **GRANTED IN PART** and **DENIED IN PART**; Defendants' Partial Motion for Summary Judgment on Complaint of Sean Pitts [Dkt. 222] is **GRANTED IN PART** and **DENIED IN PART**; and, Defendants' Motion for Summary Judgment on Complaint of Undini Sanz [Dkt. 223] is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

Dated: September 16, 2025                              /s/ Angel Kelley
                                                      Hon. Angel Kelley
                                                      United States District Judge

# Appendix I

| Remaining Claims as to Gaitor | |
|---|---|
| **(Count) Claim** | **After Summary Judgement** |
| (I) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City | Survives |
| (II) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City | Survives |
| (III) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City | Did Not Move for Summary Judgement |
| (VI) retaliation in violation of G.L. c. 151B, § 4(4), against all the Defendants | Survives as to Peeples, Castillo, and Wright-Rivera |
| (VII) retaliation in violation of 42 U.S.C. § 2000e-3(a), against the City | Survives |
| (VIII) unlawful aiding and abetting of discriminatory actions in violation of G.L. c. 151B, § 4(5), against Castillo | Survives |
| (IX) unlawful interference with Gaitor's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against Castillo, Peeples, and the City | Survives as to Peeples and Castillo |
| (X) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City | Did Not Move for Summary Judgement |
| (XI) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(3), against the City | Survives |
| (XIII) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City | Did Not Move for Summary Judgement |

| Remaining Claims as to Pitts | |
|---|---|
| **(Count) Claim** | **After Summary Judgement** |
| (I) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City | Survives |
| (II) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City | Survives |
| (III) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City | Did Not Move for Summary Judgement |
| (IV) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City | Did Not Move for Summary Judgement |
| (VIII) unlawful interference with rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against Peeples and the City | Survives as to Peeples |

| Remaining Claims as to Powell | |
|---|---|
| **(Count) Claim** | **After Summary Judgement** |
| (I) discrimination based on race and color in violation of G.L. c. 151B, § 4(1), against the City | Survives |
| (II) discrimination based on race and color in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), against the City | Survives |
| (III) discrimination based on age in violation of 29 U.S.C. § 621 et seq., against the City | Did Not Move for Summary Judgement |
| (VI) retaliation in violation of G.L. c. 151B, § 4(4), against Wright-Rivera, Peeples, and the City | Survives as to Wright-Rivera and Peeples |
| (VII) retaliation in violation of 42 U.S.C. § 2000e-3(a), against the City | Survives |
| (IX) unlawful interference with Powell's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against Peeples and the City | Survives as to Peeples |
| (X) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City | Survives |
| (XI) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(3), against the City | Survives |
| (XIII) discrimination based on age in violation of G.L. c. 151B, § 4(1C), against the City | Did Not Move for Summary Judgement |

| Remaining Claims as to Sanz | |
|---|---|
| **(Count) Claim** | **After Summary Judgement** |
| (I) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, § 185(b)(1), against the City | Survives |
| (II) retaliation in violation of the Massachusetts Whistleblower Act, G.L. c. 149, §185(b)(3), against the City | Survives |
| (X) failure to accommodate Plaintiff's disability in violation of G.L. c. 151B, § 4(16), against the City | Survives |
| (XI) failure to accommodate Plaintiff's disability in violation of 42 U.S.C. § 12111, et seq., against the City | Survives |
| (XIII) retaliation in violation of 42 U.S.C. 2000e-3(a), against the City | Survives |
| (XIV) unlawful interference with Plaintiff's rights under the anti-discrimination statute in violation of G.L. c. 151B, § 4(4A), against Peeples and the City | Survives as to Peeples |